IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

RENEE TARTAGLIONE,

          Defendant.

CRIMINAL ACTION
NO. 15-491

## OPINION

**Slomsky, J.**                                                        **April 11, 2018**

### TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 4

II.    BACKGROUND ................................................................................................. 9

III.   FINDINGS OF FACT ........................................................................................ 10

  A.   Defendant Directly Acquired $2,041,750 in Proceeds
        from Juniata Community Mental Health Clinic ("JCMHC") ........................................... 10

    1.   Defendant Acquired $615,000 in Proceeds from Above-Market Rent,
          Extra Monthly Rent, and a Rent Deposit for the 3rd Street Building ........................... 10

       i.   JCMHC Paid Above-Market Rent and Four Extra Months' Rent
            for Use of the 3rd Street Building ........................................................................... 10

       ii.  The Board of Directors of JCMHC Did Not Approve Increased Rent
            for the 3rd Street Building ...................................................................................... 15

       iii. Fair Market Rent for the 3rd Street Building Was $4,500 from May 2007
            to January 2010 and $4,800 from February 2010 to January 2013 ....................... 16

       iv. JCMHC Paid Defendant a Rent Deposit of $15,000
            for the 3rd Street Building that Was Never Returned to JCMHC ......................... 18

       v.   Defendant Acquired a Total of $615,000 in Proceeds
            from the 3rd Street Building .................................................................................... 19

    2.   Defendant Acquired $522,000 in Proceeds from Above-Market Rent
          and a Rent Deposit for the 5th Street Building ........................................................... 20

     i.   JCMHC Paid $35,000 Each Month in Above-Market Rent
        for Use of the 5th Street Building ........................................................................ 20

     ii.  The Board of Directors of JCMHC Did Not Approve $35,000
        in Monthly Rent for the 5th Street Building........................................................... 22

     iii. Fair Market Rent for the 5th Street Building Was $23,000 ................................... 23

     iv. JCMHC Paid Norris Hancock a $150,000 Rent Deposit
        for the 5th Street Building that Was Never Returned to JCMHC .......................... 25

     v.  Defendant Acquired $522,000 in Proceeds from Above-Market Rent
        and the Rent Deposit for the 5th Street Building .................................................. 26

   3.  Defendant Acquired $599,000 in Proceeds from Construction Costs
      Funded by JCMHC for the 5th Street Building ............................................................. 27

   4.  Defendant Acquired $305,750 in Proceeds from JCMHC
      Through a Check-Cashing Scheme Involving Sandy and Leslie Acosta...................... 28

 B.  The 5th Street Building Appreciated in Value by $1,126,000, with $360,100
     of this Appreciation Attributable to Construction Costs Paid by JCMHC ...................... 31

 C.  Defendant Acquired a Total of $2,401,850 in Criminal Proceeds
     as a Result of Her Scheme to Defraud JCMHC............................................................... 33

 D.  Defendant Engaged in Banking Practices that Prevented the Government
     from Tracing Money that She Acquired............................................................................ 34

IV.     LEGAL STANDARD ....................................................................................................... 35

V.      CONCLUSIONS OF LAW................................................................................................ 36

 A.  Defendant Must Forfeit a Personal Money Judgment of $2,041,750
     as Gross Proceeds Directly Obtained as the Result of Her Crimes ................................. 39

   1.  Defendant Acquired $615,000 in Criminal Proceeds from the 3rd Street Building ...... 40

   2.  Defendant Acquired $522,000 in Criminal Proceeds from Above-Market Rent
      and the Rent Deposit for the 5th Street Building............................................................ 42

   3.  Defendant Acquired $599,000 in Proceeds from Construction Costs
      Funded by JCMHC for the 5th Street Building ............................................................. 45

   4.  Defendant Acquired $305,750 in Criminal Proceeds
      from Cash Produced by the Check-Cashing Scheme ..................................................... 46

 B.  Criminal Proceeds Directly Traceable to the 3rd Street Building
     and the 5th Street Building ............................................................................................... 47

1.   The Government Has Not Proven that $25,600 in Rent-Related Funds
     Were Used to Pay the Mortgage on the 3rd Street Building ......................................... 50

2.   The Government Has Not Proven that $210,813 in Rent-Related Funds
     Were Used to Pay Down the Mortgage on the 5th Street Building But Has Proven
     that JCMHC Paid $599,000 in Construction Costs for the 5th Street Building ............ 52

     i.   The Government Has Not Proven the Requisite Nexus
          Between $210,813 in Rent-Related Funds and the 5th Street Building ................. 52

     ii.  The Government Has Proven the Requisite Nexus Between $599,000
          in Construction Costs and the 5th Street Building .................................................. 53

C.   Defendant Must Forfeit $959,100 of the Escrow Proceeds
     from the 5th Street Building, Accounting for the Building's Appreciated Value ............ 54

D.   Defendant Must Forfeit Substitute Assets to Satisfy the Forfeiture Judgment ................ 57

E.   The Forfeiture Judgment Does Not Violate the Excessive Fines Clause .......................... 62

VI.   CONCLUSION ............................................................................................................ 65

## I. INTRODUCTION

On June 23, 2017, after a five-week trial, a jury found Defendant Renee Tartaglione guilty on all counts of a fifty-three count Superseding Indictment ("Indictment"). The Indictment charged Defendant with the following:

- Conspiracy to Commit Mail Fraud, Wire Fraud, Theft from a Health Care Benefit Program, and Theft from a Program Receiving Federal Funds in Excess of $10,000, in violation of 18 U.S.C. § 371 (Count 1);

- Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1349 (Counts 2-13);

- Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (Counts 14-25);

- Theft from a Health Care Benefit Program, in violation of 18 U.S.C. § 669 (Counts 26-37);

- Theft from a Program Receiving Federal Funds in Excess of $10,000, in violation of 18 U.S.C. § 666 (Counts 38-49); and

- False Statements on Tax Returns, in violation of 26 U.S.C. § 7206(1) (Counts 50-53).

The charges stem from Defendant's conduct in charging excessive rent to Juniata Community Mental Health Clinic ("JCMHC") and causing JCMHC to issue other unjustified payments to her, all accomplished through her position as President of its Board of Directors.

In order to fully understand the nature of Defendant's acquisition of criminal proceeds in this case, a brief discussion of her scheme to defraud JCMHC is required. Defendant gained control of JCMHC through her position as President of its Board and used its money for her own personal benefit. (Doc. No. 3 at 5, ¶¶ 23-26.) She and her co-conspirators filled JCMHC's Board of Directors with individuals whom they believed would not question her conduct. (Id. at 6, ¶ 27.) Sandy Acosta, a co-conspirator and administrator at JCMHC, would fabricate Board

minutes at the direction of Defendant and Defendant's husband, Carlos Matos, to document events that had not actually been discussed with the Board. (S. Acosta Tr. at 110:15-111:5, May 31, 2017.) Defendant, Sandy Acosta, and the other co-conspirators did not disclose to JCMHC's Board of Directors that money was being taken from JCMHC to benefit Defendant. (Doc. No. 3 at 6, ¶ 29.)

While Defendant served as President of the JCMHC Board, as part of her scheme, she caused JCMHC to issue her unauthorized payments in several ways. She caused JCMHC to make payments of above-market and excessive rent to herself and then to Norris Hancock, LLC, Defendant's solely-owned company. (Id. at 6 ¶ 30(a).) JCMHC originally paid rent for use of a building located at 2254-60 North 3rd Street, Philadelphia, Pennsylvania ("3rd Street Building"), and thereafter for use of a building located at 2637-45 North 5th Street, Philadelphia, Pennsylvania ("5th Street Building"). She also continuously subjected JCMHC to unauthorized rent increases well above the fair market rate and caused JCMHC to pay undue and unjustified payments, including more than twelve months of rent in one year. (Id. ¶ 30(b)-(c).) It also was part of the conspiracy that beginning in July 2010, Defendant and her co-conspirators caused JCMHC to make unauthorized payments for repairs and renovations to a building that it ultimately would rent from Norris Hancock, located at the 5th Street Building. (Id. at 9, ¶ 50.)

As part of her scheme, Defendant also acquired money by causing JCMHC to issue checks to its employees, Sandy and Leslie Acosta, which they cashed and gave the money to Defendant. (Id. at 6, ¶ 30(d).) Defendant would sign the majority of the checks to Sandy and Leslie on behalf of JCMHC, Sandy and Leslie would cash their checks, and Sandy would give the cash to Defendant. (S. Acosta Tr. at 121:2-4; 122:6-10, May 31, 2017.) The check-cashing process fell into a pattern, in which Sandy and Leslie cashed checks every fifteen days for

amounts ending in the numbers 22 and 78, so that they would add up to a round number. (Id. at 124:13-16; 127:3-136:20.)

This conduct formed the basis of the charges against Defendant in the Indictment. (Doc. No. 3.) In Count 1, the Indictment charges all of the conduct described above as part of the manner and means and overt acts in furtherance of the conspiracy. (Id. at 5-16.) The mail fraud charges alleged in Counts 2 to 13 are based on above-market rent and extra rent paid by JCMHC for the 3rd Street Building, and a $150,000 rent deposit paid by JCMHC to Norris Hancock for the 5th Street Building. (Id. at 20, ¶ 18.) Counts 3 and 8 are based on the payment by JCMHC of extra rent checks for months not owed, Count 10 is based on the $150,000 rent deposit, and the balance of Counts 2 to 13 are based on above-market rent paid by JCMHC for use of the 3rd Street Building.

The wire fraud charges alleged in Counts 15 to 25 each are based on above-market rent paid by JCMHC to Norris Hancock for use of the 5th Street Building.[1] (Id. at 21, ¶ 22.) A single monthly rent check forms the basis of each count. The charges of theft from a healthcare benefit program alleged in Counts 26 to 37 also are based on above-market and excessive rent paid by JCMHC to Norris Hancock for the 3rd Street and 5th Street Buildings, as well as the $150,000 rent deposit paid for the 5th Street Building. (Id. at 23, ¶ 24.) Each of these counts, except for Count 32, is based on a check already included in the Indictment. Count 32 is based on a check for above-market rent paid for use of the 3rd Street Building.

Finally, the charges of theft from a program receiving federal funds alleged in Counts 38 to 49 are based on above-market and excessive rent for the 3rd and 5th Street Buildings and the

---

[1] The wire fraud charged in Count 14 is based on a check that Defendant caused JCMHC to issue for payment of Leslie Acosta's tax liability as a result of the check-cashing scheme. The Government does not seek this amount as part of its forfeiture because Defendant did not personally acquire this money as proceeds of the wire fraud offense.

$150,000 rent deposit for the 5th Street Building. (Id. at 25, ¶ 26.) The checks that form the basis of these offenses also form the basis of offenses charged in previous counts in the Indictment.

Defendant was convicted of each offense charged in Counts 1 to 49. The money that Defendant acquired from the checks charged in the Indictment account for a portion of the total money judgment the Government seeks. The Government alleges that the balance of the money that should be forfeited, though not charged in the Indictment, is proceeds of Defendant's scheme to defraud.

On October 31, 2017, the Government filed a Motion for Preliminary Order of Forfeiture. (Doc. No. 177.) The Government seeks to have Defendant forfeit a money judgment of $2,561,210. It asserts that it has arrived at this amount by tracing a portion of illicit rent payments initially made by JCMHC to Defendant personally and then to her through Norris Hancock. The 3rd Street Building was purchased on April 30, 2007 and then transferred by her on October 12, 2007 to Norris Hancock. (Exs. G-2; G-4; Carl Tr. at 74-75; 134; 136-37, May 24, 2017.) The buildings were owned by Defendant through Norris Hancock and, as noted, located at 2254-60 North 3rd Street and 2637-45 North 5th Street, Philadelphia, Pennsylvania, both of which Defendant rented to JCMHC. On June 29, 2017, the 5th Street Building was sold for $3,000,000, and $2,000,000 from this sale is presently being held in escrow.[2] (Doc. No. 177 at 18 n.13, Doc. No. 177-3.)

In order to have Defendant satisfy the total forfeited money judgment, the Government seeks to have Defendant forfeit substitute assets which consist of real estate that she owns. The properties are located at 2254-60 North 3rd Street, Philadelphia, Pennsylvania; 2637-45 North

---

[2]   These funds are being held by the United States Marshals Service in a Seized Asset Deposit Fund that is earning interest.

5th Street, Philadelphia, Pennsylvania; 6615 Monmouth Avenue, Ventnor, New Jersey; 9401-11 Pacific Avenue, Apartment 9, Margate, New Jersey; and 2118-20 North Hancock Street, Philadelphia, Pennsylvania.

For reasons that follow, the Motion for Preliminary Order of Forfeiture (Doc. No. 177) will be granted in part and denied in part.[3]

First, the Court finds that the Government is entitled to a total money judgment of $2,401,850. This amount includes $2,041,750 that Defendant directly acquired from JCMHC through above-market and excessive rent and a rent deposit on the 3rd Street Building; above-market rent and a rent deposit on the 5th Street Building; construction costs paid by JCMHC to renovate the 5th Street Building; and cash acquired from a check-cashing scheme involving Sandy and Leslie Acosta, two JCMHC employees.

Second, the Court finds that the Government has sufficiently traced $959,100 of proceeds into the 5th Street Building, and that proportion of the 5th Street Building is directly forfeitable. This amount is arrived at by adding the sum of $599,000 in construction costs that JCMHC paid for the 5th Street Building and $360,100 in appreciation on that amount, which is derived from a proportional amount of the sale price of the building, given the costs of construction. The Government is entitled only to $360,100 in appreciation on the construction costs because the Government did not prove that mortgage payments on the 5th Street Buildings were made with criminal proceeds from unauthorized rent payments that went to Norris Hancock. The Government also has not proven that mortgage payments on the 3rd Street Building were made

---

[3] On January 10, 2018, Defendant filed a Memorandum in Opposition to the Government's Motion for a Preliminary Order of Forfeiture (Doc. No. 197), and on January 17, 2018, the Government filed a Reply (Doc. No. 201).

On January 18 and 19, 2018, the Court held a hearing on the Motions at which witness testimony and documentary evidence were introduced. Following the hearing, the Government and Defendant filed supplemental briefs. (Doc. Nos. 206, 207, 209, 210.)

with criminal proceeds from unauthorized rent payments that went to Norris Hancock and thus those payments will not be forfeited as direct proceeds as well.

Third, the Court finds that the Government has met its burden of proving the statutory requirements for forfeiture of substitute assets and therefore is entitled to forfeiture of the remaining amount due derived from Defendant's real estate holdings.

## II. BACKGROUND

In 2002, JCMHC was incorporated in Pennsylvania as a domestic nonprofit corporation to operate a community mental health clinic and provide mental health services to individuals in the community. (Ex. G-1A; Carl Tr. at 18-19, May 24, 2017.) JCMHC was originally located at 1116-18 East Luzerne Street, Philadelphia, Pennsylvania.[4] (Carl Tr. at 23, May 24, 2017.)

JCMHC received the majority of its income through a Provider Agreement with Community Behavioral Health ("CBH"), a Pennsylvania not-for-profit corporation. (Ex. G-503; S. Acosta Tr. at 50:13-18, May 31, 2017.) The Provider Agreement established that CBH would pay JCMHC to provide mental health services to members of the local community. (Ex. G-503; Carl Tr. at 40, May 24, 2017.) CBH paid JCMHC with Medicaid funds received from the United States government and the Commonwealth of Pennsylvania. (Doc. No. 3 at 2, ¶ 5; Ex. G-503.)

On March 2, 2004, the JCMHC Board of Directors was appointed. (Ex. G-504; Carl Tr. at 20-21, May 24, 2017.) Carlos Matos, Defendant's husband, was appointed President, and Defendant was appointed Treasurer. (Ex. G-504.) In early 2007, after Matos stepped down from the Board to begin serving a sentence in federal prison, Defendant became President of the Board of Directors. (S. Acosta Tr. at 70:7-23, May 31, 2017.)

---

[4] JCMHC moved into the 3rd Street Building in early 2006.

## III. FINDINGS OF FACT[5]

### A. Defendant Directly Acquired $2,041,750 in Proceeds from Juniata Community Mental Health Clinic ("JCMHC")

The $2,041,750 that Defendant directly acquired from JCMHC is derived from four sources: (1) $615,000 from above-market and excessive rent and a rent deposit paid by JCMHC for use of the 3rd Street Building; (2) $522,000 from above-market rent and a rent deposit paid by JCMHC for use of the 5th Street Building; (3) $599,000 from construction costs paid by JCMHC to renovate the 5th Street Building; and (4) $305,750 from cash acquired from a check-cashing scheme involving Sandy and Leslie Acosta, two JCMHC employees.

#### 1. Defendant Acquired $615,000 in Proceeds from Above-Market Rent, Extra Monthly Rent, and a Rent Deposit for the 3rd Street Building

##### i. JCMHC Paid Above-Market Rent and Four Extra Months' Rent for Use of the 3rd Street Building

1. As noted, in early 2006, JCMHC moved from its original location at 1116-18 East Luzerne Street, Philadelphia, Pennsylvania to the 3rd Street Building, which was originally owned by an individual named Daniel Labrador. From April 2006 to April 2007, JCMHC paid $4,500 per month in rent to Labrador under the terms of a lease entered into by the parties. (Exs. G-114 at 3-11; G-115; Carl Tr. at 79, 82, May 24, 2017.)

2. On April 30, 2007, Labrador sold the 3rd Street Building to Defendant Renee Tartaglione for $317,000, and in May 2007, JCMHC began to pay rent to Defendant rather than to Labrador. (Ex. G-2; Carl Tr. at 74-75; 134, May 24, 2017.)

---

[5] Many witnesses testified at trial and at the forfeiture hearing. Unless otherwise indicated in this Opinion, the Court will only refer to those witnesses that it has found to be credible and reliable. In addition, unless otherwise indicated, when the Court quotes or refers to the testimony of a specific witness, the Court is finding that the testimony has been proven as a fact, and that fact is relied on in reaching conclusions of law in this case. An opposing contention of a party may be referred to in the Findings of Fact merely to highlight the positions of the parties on a specific matter.

3.      On May 21, 2007, JCMHC entered into another commercial lease to rent the 3rd Street Building, with Defendant as lessor and JCMHC as lessee. (Ex. G-514.) The lease provided that its term would run from May 21, 2007 to May 21, 2012 and that the rent would be $90,000 per year in monthly payments of $7,500. (Id. at 1.)

4.      On May 24, 2007, JCMHC paid its first rent check to Defendant for $7,500, which she endorsed and deposited.[6] (Exs. G-116 at 1-2; G-536; Carl Tr. at 92, May 24, 2017.)

5.      On June 1, 2007, Defendant incorporated Norris Hancock, LLC, a company solely owned by Defendant. (Ex. G-1B; Carl Tr. at 74-75; 96-97, May 24, 2017.) After the first rent check went to Defendant personally, JCMHC began to pay rent for the 3rd Street Building to Norris Hancock. (Id. at 97.) On June 21, 2007, JCMHC paid $7,500 in rent to Norris Hancock for the first time using check number 1731. (Ex. G-117A at 1; Carl Tr. at 98, May 24, 2017.) This check was paid by JCMHC using its checking account ending in 1831 at Washington Savings Bank and was cashed at a check-cashing company named J&R Check Cashing. (Ex. G-117A at 1; Carl Tr. at 49-50; 99, May 24, 2017.)

6.      On October 12, 2007, Defendant officially transferred ownership of the 3rd Street Building to Norris Hancock for $1. (Ex. G-4; Carl Tr. at 136-37, May 24, 2017.)

---

[6]   Defendant's signatures on the first rent check and the rent checks issued thereafter were identified by Joseph Carl, an Internal Revenue Service ("IRS") Special Agent who investigated this case. During trial, Agent Carl testified that Defendant's signature on a fingerprint card she signed when processed following her arrest was consistent with her signature on financial documents he had examined during his investigation. (Ex. G-81; Carl Tr. at 15:2-16:18, May 25, 2017.)

Sandy Acosta, a JCMHC administrator, also identified Defendant's signature on the rent checks as belonging to Defendant. (S. Acosta Tr. at 48:20; 73:15-76:2, May 31, 2017.)

7.     From June 2007 to April 2009, JCMHC continued to pay $7,500 per month in rent to Norris Hancock.[7] (Exs. G-117A to G-117C; Carl Tr. at 108, May 24, 2017.) Washington Savings Bank records do not include a rent check for October 2008, however.

8.     On May 21, 2009, JCMHC's rent for the 3rd Street Building was increased by Defendant through Norris Hancock from $7,500 to $10,000. (Exs. G-12 at 5; G-117C at 5; G-518; Carl Tr. at 108, May 24, 2017.)

9.     From May 2009 to November 2010, JCMHC paid $10,000 per month in rent to Norris Hancock.[8] (Exs. G-117C at 6-12; G-117D; Carl Tr. at 118-119, May 24, 2017.) In 2010,

---

[7] These rent checks issued by JCMHC to Norris Hancock for use of the 3rd Street Building are dated from June 2007 to April 2009. The check number and the date on which the check was written are as follows: Check 1731, June 21, 2007; Check 1773, July 18, 2007; Check 1848, August 17, 2007; Check 1925, September 14, 2007; Check 1997, October 11, 2007; Check 2067, November 8, 2007; Check 2149, December 20, 2007; Check 2228, January 17, 2008; Check 2324, February 14, 2008; Check 2363, March 14, 2008; Check 2454, April 10, 2008; Check 2600, May 22, 2008; Check 2649, June 20, 2008; Check 2733, July 17, 2008; Check 2795, August 14, 2008; Check 2912, September 25, 2008; Check 3074, November 21, 2008; Check 3153, December 19, 2008; Check 3273, January 19, 2009; Check 3349, February 12, 2009; Check 3445, March 13, 2009; and Check 3549, April 24, 2009. (Exs. G-117A to G-117C.)

Each check, except for Check 1731 dated June 21, 2007, was signed by Defendant on behalf of JCMHC and endorsed by Defendant on behalf of Norris Hancock. Each check lists on the "for" line that it is for "Rent" or "Office Rent." In addition, Washington Savings Bank records reveal that $7,500 in rent was paid to Norris Hancock each month, except for October 2008. Neither Washington Savings Bank records nor the rent receipts and records found at JCMHC verify a rent payment for that month.

[8] These rent checks issued by JCMHC to Norris Hancock for use of the 3rd Street Building are dated from May 2009 to November 2010. The check number and the date on which the check was written are as follows: Check 3662, May 21, 2009; Check 3742, June 15, 2009; Check 3792, July 16, 2009; Check 3875, August 13, 2009; Check 3961, September 11, 2009; Check 4066, October 9, 2009; Check 4116, November 5, 2009; and Check 4194, December 4, 2009; Check 4351, January 15, 2010; Check 4440, February 11, 2010; Check 4521, March 11, 2010; Check 4615, April 9, 2010; Check 4717, May 7, 2010; Check 4848, June 4, 2010; Check 1132, June 25, 2010; Check 4938, July 15, 2010; Check 5064, August 12, 2010; Check 5166, September 10, 2010; Check 5207, September 16, 2010; Check 5258, September 24, 2010; Check 5312, October 8, 2010; and Check 5387, November 5, 2010. (Exs. G-117C

JCMHC paid fourteen months of rent to Norris Hancock rather than twelve months of rent.[9] (Exs. G-117D; G-701; Carl Tr. at 150-51, May 24, 2017.)

10.     On December 31, 2010, JCMHC's rent increased from $10,000 to $15,000.  (Ex. G-117D at 16; Carl Tr. at 119, May 24, 2017.)  Co-conspirator Sandy Acosta, an administrator at JCMHC, prepared a new lease to reflect this rental rate.  (Ex. G-519; Carl Tr. at 80:11-19, May 31, 2017.)  On January 10, 2011, the lease was signed by Defendant on behalf of Norris Hancock and by Sandy Acosta on behalf of JCMHC.  (Ex. G-519 at 3.)

11.     Defendant signed each rent check issued on behalf of JCMHC and endorsed each rent check received on behalf of Norris Hancock.  (Exs. G-117A to 117E.)  Beginning with the rent check dated September 23, 2011, however, Leonard Brown, a member of JCMHC's Board of Directors, began to sign the rent checks on behalf of JCMHC rather than Defendant.  (Ex. G-117E at 10; Carl Tr. at 121, May 24, 2017.)

12.     From December 2010 to November 2011, JCMHC paid $15,000 per month in rent to Norris Hancock.[10]  (Exs. G-117D at 16; G-117E.)  In 2011, JCMHC paid Norris Hancock rent

---

at 5; G-117D.)

Each check was signed by Defendant on behalf of JCMHC and endorsed by Defendant on behalf of Norris Hancock.  Each check lists on the "for" line that it is for "Rent" or "Office Rent."  In addition, Washington Savings Bank records reveal that $10,000 in rent was paid to Norris Hancock each month, with two additional months paid in 2010.  (Exs. G-117D; G-701; Carl Tr. at 150-51, May 24, 2017.)

[9]   As noted supra, in note 8, JCMHC paid rent twice in June and September 2010.  (Ex. G-117D.)

[10]   These rent checks issued by JCMHC to Norris Hancock for use of the 3rd Street Building are dated from December 2010 to November 2011.  The check number and the date on which the check was written are as follows: Check 5665, December 31, 2010; Check 5793, February 10, 2011; Check 5916, March 10, 2011; Check 5956, March 15, 2011; Check 6011, April 8, 2011; Check 6106, May 5, 2011; Check 6207, June 3, 2011; Check 6309, June 20, 2011; Check 6404, July 29, 2011; Check 6508, August 26, 2011; Check 6612, September 23, 2011;

for thirteen months, rather than for twelve months.[11]  (Exs. G-117D; G-117E; G-701, Carl Tr. at 151, May 24, 2017.)

13.     On December 16, 2011, JCMHC's rent again increased from $15,000 to $25,000. (Ex. G-117E at 13; Carl Tr. at 123, 151, May 24, 2017.)  Like the rent checks before it, the rent check dated December 16, 2011 was endorsed by Defendant.  (Ex. G-117E at 13; Carl Tr. at 124, May 24, 2017.)  On December 31, 2011, a new lease was executed to reflect this new rent amount.  (Ex. G-520.)  The new lease was signed by Defendant on behalf of Norris Hancock and by Sandy Acosta on behalf of JCMHC.  (Id. at 3.)

14.     From December 2011 to December 2012, JCMHC paid $25,000 per month in rent to Norris Hancock.[12]  (Exs. G-117E at 13; G-117F; G-701.)  In 2012, JCMHC paid Norris Hancock rent for thirteen months rather than for twelve months, just as it did in 2011.  (Exs. G-117E at 13; G-701.)

---

Check 6734, October 21, 2011; and Check 6855, November 18, 2011.  (Exs. G-117D at 16; G-117E.)

Each check lists on the "for" line that it is for "Rent" or "Office Rent."  Washington Savings Bank records reveal that $15,000 in rent was paid to Norris Hancock each month, with an additional month's rent paid in 2011.  (Exs. G-117E; 701; Carl Tr. at 151, May 24, 2017.)

[11]   As noted supra, in note 10, JCMHC paid rent twice in March 2011.  (Ex. G-117E at 2-3.)

[12]   These rent checks issued by JCMHC to Norris Hancock for use of the 3rd Street Building are dated from December 2011 to December 2012.  The check number and the date on which the check was written are as follows: Check 6932, December 16, 2011; Check 7065, January 13, 2012; Check 7211, February 10, 2012; Check 7319, March 9, 2012; Check 7418, April 5, 2012; Check 7527, May 4, 2012; Check 7599, June 1, 2012; Check 7715, June 29, 2012; Check 7858, July 27, 2012; Check 7949, August 24, 2012; Check 8055, September 21, 2012; Check 8175, October 19, 2012; and Check 8281, November 16, 2012.  (Exs. G-117E at 13; G-117F.)

Leonard Brown signed each check on behalf of JCMHC, and Defendant endorsed each check on behalf of Norris Hancock.  Washington Savings Bank records reveal that $25,000 in rent was paid to Norris Hancock each month, with an additional month paid in 2012.  (Exs. G-117F; G-701; Carl Tr. at 151, May 24, 2017.)

15. Four extra rent checks for the 3rd Street Building were paid by JCMHC to Norris Hancock from 2010 to 2012 and total $65,000. (Exs. G-117D to G-117F; G-701; Carl Tr. at 149-51, May 24, 2017.) These checks do not correspond to a month for which rent was owed but nonetheless were deposited into the bank account of Norris Hancock.

16. Sandy Acosta, a JCMHC administrator, testified that she would prepare these extra rent checks to Norris Hancock as advance rent checks but that they were never credited to JCMHC for rent. (S. Acosta Tr. at 106:22-107:15, May 31, 2017.)

17. Extra rent check 5956, dated March 15, 2011, is the basis of Counts 3, 27, and 39 of the Indictment, and extra rent check 7065, dated January 13, 2012, is the basis of Count 8 of the Indictment. (Doc. No. 3 at 20, 23, 25.) The jury convicted Defendant on the charges in each of these counts.

18. Defendant obtained rent checks each month from JCMHC through her company, Norris Hancock, except for in October 2008. The checks totaled $842,500. In addition, Defendant acquired $65,000 in extra rent payments on the 3rd Street Building through her company, Norris Hancock. Defendant was responsible for causing the rent to rise from $4,500 a month to $25,000 a month, and for the issuance of the additional rent checks and the rental deposit that was never returned to JCMHC. (See Exs. G-116; G-116A; G-117A to G-117F; S. Acosta Tr. at 78:13-16, May 31, 2017; Carl Tr. at 32:20-24, June 13, 2017.)

### ii. The Board of Directors of JCMHC Did Not Approve Increased Rent for the 3rd Street Building

19. Based on witness testimony at trial, JCMHC's Board of Directors did not approve the increased rent paid for the 3rd Street Building starting on May 24, 2007. And Leonard Brown, when he became a member of JCMHC's Board of Directors in 2011 and began to sign rent checks on behalf of JCMHC, did not approve rent increases for the 3rd Street Building.

20.     Sandy Acosta and David Rosario, another member of JCMHC's Board, testified that the Board did not meet regularly, and that several months often would pass between Board meetings.  (S. Acosta Tr. at 71:20-72:16, May 31, 2017; Rosario Tr. at 66:14-18, June 5, 2017.)

21.     JCMHC's Board of Directors did not see any of the leases reflecting the rent increases for the 3rd Street Building and never discussed the rent that JCMHC paid.  (S. Acosta Tr. at 85:13-22, May 31, 2017.)  Rosario did not know what JCMHC paid in rent to Norris Hancock, and the JCMHC Board did not vote on the amount of rent to be paid.  (Rosario Tr. at 84:14-85:16, June 5, 2017.)

22.     Sandy Acosta, who was responsible for taking Board meeting minutes, would fabricate Board minutes to document events that had not actually been discussed with the Board of Directors.  (S. Acosta Tr. at 110:15-111:1, May 31, 2017.)  She testified that she did so at the direction of Defendant and Carlos Matos, Defendant's husband.  (Id. at 11:4-5.)

23.     Leonard Brown testified that although he signed rent checks on behalf of JCMHC, he was not responsible for ensuring that the checks were for legitimate expenses and amounts.  (Brown Tr. at 13:21-25, June 7, 2017.)  Moreover, he stated that he never saw a lease to support the checks that he signed, and as a member of the Board was not asked to approve rent increases.  (Id. at 18:12-19; 21:7-18.)

24.     Neither JCMHC's Board of Directors nor Brown approved the rent amounts for the 3rd Street Building.

### iii.     Fair Market Rent for the 3rd Street Building Was $4,500 from May 2007 to January 2010 and $4,800 from February 2010 to January 2013

25.     On January 30, 2007, real estate appraiser George Hoez prepared an appraisal report of the 3rd Street Building for First Penn Bank.  (Ex. G-403; Hoez Tr. at 27:3-5, May 30,

2017.)  The 3rd Street building was a one-story office building, 6,130 square feet in size.  (Ex. G-403 at 13; Hoez Tr. at 29:7-11, May 30, 2017.)

26.     When performing an appraisal, Hoez compares the terms of the lease to rentals in the market to determine whether the lease is above, below, or in line with the market rate.  (Hoez Tr. at 30:9-18, May 30, 2017.)  Here, he compared the terms of the original lease that JCMHC had with Labrador with five comparable medical office buildings in the area, taking into account adjustments such as size, location, and expenses.  (Ex. G-403 at 28; Hoez Tr. at 38:3-8; 86:15, May 30, 2017.)

27.     To perform his appraisal, Hoez also inspected the interior of the 3rd Street Building.  (Hoez Tr. at 88:15-89:24, May 30, 2017.)  In his appraisal report, Hoez described the interior of the building as follows:

> The main entrance is form [sic] a vestibule entrance from North 3rd Street. The vestibule is finished with ceramic tile floor and painted wall surfaces.  The vestibule provides access to a large lobby area.  The lobby contains a receptionist desk, medical records room, and the men's and ladies' restrooms.  In addition there are two private offices and a large conference room with a private three piece bathroom and kitchenette.  The rear portion of the building includes additional private offices, a children's waiting area with several additional private office [sic], and a small unfinished storage area served by a large drive in door from Orianna Street.
>
> The typical interior finishing includes wall to wall carpeting or resilient tile floor, painted drywall wall surfaces and suspended tile ceiling in the majority of the building.  Some of the offices in the children's area have painted concrete blocks.

(Ex. G-403 at 14.)  After comparing the terms of the lease with Labrador to the market rental rate, Hoez determined that the rental rate in the lease was in line with market rental rate.  (Hoez Tr. at 40:5-7, May 30, 2017.)

28.     Based on the testimony of Hoez, the rental rate in the lease with Labrador was the fair market rental rate.  Thus, from May 2007, when JCMHC paid its first rent check to

Defendant, to January 2010, fair market rent for use of the 3rd Street Building was $4,500 a month.  (Exs. G-403 at 15; G-403A.)  From February 2010 to January 2013, fair market rent was $4,800.[13]  (Id.)

29.     Given the above findings in paragraphs 25 to 28, JCMHC wrongfully overpaid $535,000 in rent which went to Defendant directly and through her company, Norris Hancock.

### iv.     JCMHC Paid Defendant a Rent Deposit of $15,000 for the 3rd Street Building that Was Never Returned to JCMHC

30.     On May 29, 2007, shortly after Defendant purchased the 3rd Street Building, JCMHC paid Defendant $15,000 using check number 1668 as an office rent deposit.  (Exs. G-

---

[13]  By contrast, Defendant contends that the fair market rent for the 3rd Street Building should be $10,000 per month.  (Doc. No. 197 at 18-19.)  On cross-examination at trial, counsel for Defendant asked Hoez whether he had stated that $10,000 per month "might be an appropriate rent in the future from when [Hoez] did the report."  (Hoez Tr. at 81:14-16, May 30, 2017.)  Hoez responded that he "never said that."  (Id. at 81:21.)

Defendant points to the summary of Hoez's interview with the Federal Bureau of Investigation ("FBI") in arguing that the fair market rent for the 3rd Street Building could be $10,000.  (Doc. No. 197-3 at 3.)  The summary provides:

If the owner added a second floor onto the building, there might be a change in its value.

    $10,000 a month rent for this building could be a fair rent, but he hasn't looked at the lease, market value, or the building.  Depending on the condition of the building, Hoez felt $10.00 to $12.00 a square foot for the building located at 2254 North 3rd Street was "pushing it."  If the owner added a second floor to the property, more rent would be justified.

(Id.)  Thus, to the extent that Hoez discussed a fair market rent of $10,000, this rate arguably would only apply if a second floor was added to the building.

Defendant also contends that the testimony of her husband, Carlos Matos, at the forfeiture hearing supports her argument that substantial improvements were made to the interior of the 3rd Street Building after the appraisal, justifying a higher market rent.  (Doc. No. 207 at 2.)  And she argues that Matos's testimony supports her position that the rental rate in the lease with Labrador was based on what Labrador paid on his mortgage and thus was not a market rate.  (Id.)  The Court does not find Matos's testimony to be credible because it is uncorroborated and/or unsupported by documents or records.

116 at 2; G-116A; Carl Tr. at 26:22-27:8, May 25, 2017.) The check was signed by Defendant on behalf of JCMHC and was endorsed by Defendant. (Id.)

31.     The commercial lease between JCMHC and Defendant did not include a provision requiring payment of a rent deposit. (Ex. G-514.) Paragraph 16 of the lease, entitled "Security Deposit," provides: "Lessee shall deposit with Lessor on the signing of this lease the sum of N/A Dollars ($ N/A) as security for the performance of Lessee's obligations under this lease . . . ." (Id. at 3.)

32.     The bank records of JCMHC and Defendant do not include any record of this rent deposit being returned to JCMHC. (Carl Tr. at 29:11-16, May 25, 2017.)

33.     Instead, Defendant spent the money. Internal Revenue Service ("IRS") Special Agent Joseph Carl testified at trial: "After [the $15,000 deposit] was drawn on the clinic's account it was deposited into . . . one of the Defendant's personal bank accounts and from there, over about the course of the next month it was spent." (Carl Tr. at 32:20-25, June 13, 2017.)

34.     The $15,000 rent deposit paid by JCMHC for the 3rd Street Building was not a legitimate payment treated as a rent deposit and was used for Defendant's personal expenses.

### v.     Defendant Acquired a Total of $615,000 in Proceeds from the 3rd Street Building

35.     The money that Defendant obtained from the 3rd Street Building derives from three sources: (1) $535,000 in above-market rent; (2) $65,000 in extra rent checks; (3) and the $15,000 deposit.

36.     First, Defendant's gains from above-market rent total $535,000. From May 2007 to December 2012, JCMHC paid $535,000 in excess of the fair market rent for the 3rd Street Building. (Exs. G-117A to G-117F; G-536; G-537; G-538A; G-538B; Carl Tr. at 141, May 24,

2017; see also Exs. G-700; G-701.)  This amount accounts for the fact that JCMHC did not pay rent to Norris Hancock for October 2008.  (Exs. G-12 at 1165; G-117B; G-537.)

37.     Second, the four extra monthly rent checks JCMHC paid for the 3rd Street Building total $65,000.  (Exs. G-117D to G-117F; G-701; Carl Tr. at 149-51, May 24, 2017.)

38.     Third, JCMHC paid Norris Hancock a rent deposit of $15,000 that was never returned to JCMHC.  (Ex. G-116 at 2; Carl Tr. at 29:11-16, May 25, 2017.)

39.     Together, these three sources total $615,000 in money Defendant acquired illegally from JCMHC for the 3rd Street Building.

### 2. Defendant Acquired $522,000 in Proceeds from Above-Market Rent and a Rent Deposit for the 5th Street Building

#### i. JCMHC Paid $35,000 Each Month in Above-Market Rent for Use of the 5th Street Building

40.     On December 1, 2011, Norris Hancock, Defendant's solely-owned company, purchased the six-floor 5th Street Building from Candelario Lamboy for $650,000.  (Ex. G-80; Carl Tr. at 137:5-10, June 13, 2017.)

41.     On November 30, 2012, JCMHC entered into a commercial lease with Norris Hancock for the 5th Street Building.  (Ex. G-533; Carl Tr. at 18:4-17, May 25, 2017.)

42.     The lease term was from November 30, 2012 to November 30, 2017, and the monthly rent that JCMHC would pay to Norris Hancock was $75,000.  (Ex. G-533 at 1; Carl Tr. at 19:10-20, May 25, 2017.)  The lease also contained an addendum, which provided:

> The parties agree to an adjustment of the terms of the lease to account for the benefit provided to Norris/Hancock, LLC by virtue of the improvements to the facility in the amount of $40,000 per month for the six (6) floor facility for a period of 24 months, making the rental for the facility the sum of $35,000 per month for a period of 24 months, and $75,000 per month thereafter.

(Ex. G-533 at 6.)

43.     The lease was signed by Defendant on behalf of Norris Hancock as landlord and by co-conspirator Sandy Acosta on behalf of JCMHC as tenant.  (Id. at 5.)

44.     In December 2012, JCMHC moved the clinic from the 3rd Street Building to the 5th Street Building.  (Carl Tr. at 6:4-7, May 25, 2017; S. Acosta Tr. at 97:20, May 31, 2017.)

45.     On December 14, 2012, JCMHC made its first rent payment to Norris Hancock for the 5th Street Building in the amount of $35,000 using check number 8382.  (Ex. G-19B; Carl Tr. at 8:11-21, May 25, 2017.)  It did so even though it had already paid Norris Hancock $25,000 in rent for December for the 3rd Street Building.  (Exs. G-117F; G-701.)  Rent payments for use of the 5th Street Building were made from a checking account ending in 4650 at Hyperion Bank.  (Ex. G-19.)

46.     From December 2012 to February 2015, JCMHC continued to pay $35,000 in rent to Norris Hancock for the 5th Street Building.[14]  (Carl Tr. at 139:1-6, June 13, 2017.)

---

[14] These rent checks are listed with the check number and the date on which the check was written as follows: Check 8382, December 14, 2012; Check 8443, January 8, 2013; Check 8583, February 8, 2013; Check 8690, March 8, 2013; Check 8769, April 5, 2013; Check 8936, May 3, 2013; Check 9060, May 31, 2013; Check 9245, June 28, 2013; Check 9339, July 26, 2013; Check 9476, August 23, 2013; Check 9537, September 20, 2013; Check 9674, October 31, 2013; Check 9768, November 27, 2013; Check 9875, December 27, 2013; Check 9977, January 24, 2014; Check 10032, February 21, 2014; Check 10098, April 4, 2014; Check 10015, May 2, 2014; Check 10143, May 30, 2014; Check 10178, July 10, 2014; Check 10210, August 1, 2014; Check 10241, August 22, 2014; Check 10260, October 3, 2014; Check 10308, November 10, 2014; Check 10310, November 14, 2014; Check 10361, December 18, 2014; Check 10416, January 9, 2015; Check 10456, February 27, 2015.  (Exs. G-19B to G-19E; G-135O to G-135X.)

Leonard Brown signed each check on behalf of JCMHC, and Defendant endorsed each check on behalf of Norris Hancock.  (Ex. G-19; Carl Tr. at 64, May 24, 2017.)

47.     From March 2015 to October 2015, JCMHC made the $35,000 rent payments to Norris Hancock in partial payments using multiple checks.  (Ex. G-19E; Forfeiture Hr'g Ex. G-2.)  These rent payments covered rent for March, April, May, and June 2015.[15]  (Id.)

48.     Thus in total, from December 2012 to June 2015, JCMHC paid Norris Hancock $35,000 in rent each month for the 5th Street Building.

### ii.     The Board of Directors of JCMHC Did Not Approve $35,000 in Monthly Rent for the 5th Street Building

49.     Based on witness testimony at trial, the JCMHC Board of Directors did not approve the $35,000 rent amount paid for the 5th Street Building.

50.     As noted, Sandy Acosta and David Rosario both testified that the Board of Directors did not meet regularly and there were often several months between Board meetings.  (S. Acosta Tr. at 71:20-21; 72:14-16, May 31, 2017; Rosario Tr. at 66:14-18, June 5, 2017.)

51.     Rosario testified that he did not know what JCMHC paid in rent and that the JCMHC Board did not vote on the amount of rent.  (Rosario Tr. at 84:14-85:16, June 5, 2017.)

---

[15]  The partial rent checks for the 5th Street Building from March 2015 to October 2015 are listed with the check number and the date on which the check was written as follows:

1. March Rent: Check 10477, March 27, 2015; Check 10566, June 12, 2015; Check 10591, June 26, 2015.

2. April Rent: Check 10607, July 10, 2015; Check 10628, July 24, 2015; Check 10634, July 31, 2015.

3. May Rent: Check 10655, August 21, 2015; Check 10659, August 21, 2015; Check 10668, September 2, 2015; Check 10679, September 10, 2015.

4. June Rent: Check 10680, September 10, 2015; Check 10702, October 1, 2015; Check 10713, October 8, 2015; Check 10729, October 16, 2015; Check 10751, October 22, 2015.

Leonard Brown signed each check on behalf of JCMHC.  The memo line for each check provides that it is partial rent for a specified month.  (Ex. G-19E; Forfeiture Hr'g Ex. G-2.)

52.     At the direction of Defendant and Carlos Matos, Sandy Acosta would fabricate Board minutes to document events that had not been discussed with the Board of Directors. (S. Acosta Tr. at 110:15-111:5, May 31, 2017.)

53.     Finally, Nilza Perez, another member of the Board of Directors, testified that she never saw a lease between JCMHC and anyone else. (Perez Tr. at 218:9-11, June 5, 2017.)

54.     Based on this evidence, the Court finds that JCMHC's Board of Directors did not approve the $35,000 rent amount for the 5th Street Building.

### iii.     Fair Market Rent for the 5th Street Building Was $23,000

55.     On March 1, 2013, real estate appraiser Anthony Salvitti, Jr., prepared an appraisal report of the 5th Street Building for Philadelphia Federal Credit Union. (Ex. G-18C; Salvitti Tr. at 14:14-15:24, June 7, 2017.)

56.     The 5th Street building was a 23,110 square-foot five-story office building. (Salvitti Tr. at 21:24-25, June 7, 2017.) At the time of the appraisal, the fourth floor was almost completely renovated, but the fifth floor was unfinished. (Id. at 22:3-4.)

57.     For the appraisal, Salvitti assumed that the fourth and fifth floors would be completely renovated to be used as an office in accordance with plans and specifications provided to him. (Id. at 23:12-14; 46:6-15.) He did not include $150,000, the estimated cost of the renovations, to arrive at a fair market value for the building. (Id. at 23:15-19.)

58.     The lease for the 5th Street Building provided that the rent would be $75,000 a month for a five-year period beginning in 2012. (Ex. G-18C at 106; Salvitti Tr. at 29:5-18, June 7, 2017.) The lease further provided that for the first two years of the lease, the rent would be reduced from $75,000 to $35,000 because the tenant had made improvements to the building. (Ex. G-18C at 106; Salvitti Tr. at 29:5-18, June 7, 2017.)

59.     When performing an appraisal, Salvitti compares the terms of the lease to rentals in the market to determine whether the lease is consistent with the market.  (Salvitti Tr. at 31:12-18, June 7, 2017.)  In this case, Salvitti compared the terms of the lease with three comparable buildings in the market, considering adjustments such as location and expenses.  (Id. at 31:19-21; 37:4-39:7.)  After making all adjustments, Salvitti concluded that the fair market rent for the 5th Street Building was $23,000 a month.[16]  (Salvitti Tr. at 45:21-46:10, June 7, 2017.)  This amount assumed that the fourth and fifth floors would be renovated as office space.[17]  (Id. at 46:6-9.)

60.     On June 23, 2014, when a search warrant was executed to search the 5th Street Building, the agents found that the fourth floor was unused and the fifth floor remained incomplete with no walls or floor.  (Exs. G-557; G-558; Carl Tr. at 22:15-22, May 25, 2017.)

61.     Based on the testimony of Salvitti and the fact that the fourth and fifth floors were never used, the Court finds that the fair market rental rate for the 5th Street Building during the rental term was $23,000.  (Ex. G-18C at 108; Salvitti Tr. at 45:21-46:10, June 7, 2017).  Any amount paid by JCMHC above $23,000 for rent to Norris Hancock was wrongfully acquired by Defendant.

---

[16]  Salvitti arrived at the rental rate of $23,000 after reviewing his appraisal report and considering additional adjustments not included in his report.  In his appraisal report, Salvitti concluded that the fair market rent for the 5th Street Building was $23,500.  (Ex. G-18C at 108.)  However, upon further review of his report and consideration of relevant adjustments regarding comparable rental rates in the area, Salvitti testified that $23,000 was the fair market rental rate.  (Salvitti Tr. at 45:2-46:10, June 7, 2017.)  This $23,000 figure assumed that the top two floors of the building would be finished as office space.  (Id. at 46:6-10.)

[17]  Defendant argues that Salvitti's $23,000 market rental rate is not accurate because he admitted on cross-examination that if he had known that JCMHC could not move to a different location due to its license, his valuation would have changed.  (Doc. No. 197 at 21; see also Salvitti Tr. at 58:5-11, June 7, 2017.)  In reality, however, Salvitti testified that although he would give consideration to this fact had he known about it, it "wouldn't change the market rent from an estimation point of view."  (Salvitti Tr. at 58:15-23, June 7, 2017.)  Additionally, Defendant's argument is based on a hypothetical rather than evidence in the record.  Thus, the Court is unpersuaded by Defendant's argument that the fair market rent of the 5th Street Building should have been greater than $23,000.

### iv. JCMHC Paid Norris Hancock a $150,000 Rent Deposit for the 5th Street Building that Was Never Returned to JCMHC

62. On April 5, 2012, JCMHC paid Norris Hancock $150,000 using check number 7226 for "Rent Deposit 2637-45 N. 5th St." (Exs. G-117F at 5; G-538A at 44; Carl Tr. 30:22-31:20, May 25, 2017.) Defendant endorsed the check. (Id.)

63. Sandy Acosta prepared the $150,000 check at the direction of Matos and executed a lease as documentation to cover the payment. (Ex. G-521; S. Acosta Tr. at 94:6-95:25, May 31, 2017.) Apart from this lease prepared to cover the payment, the commercial lease for the 5th Street Building states that the tenant shall pay a deposit of $150,000 to be held as security for any damages the tenant may cause. (Ex. G-533.)

64. The rent check stub for the $150,000 provides that its purpose is to pay Norris Hancock for "Rent Dep., 2637 N. 5th St. May, June & July." (Ex. G-538A at 44.) As noted, however, JCMHC did not move into the 5th Street Building until December 2012, and JCMHC paid rent for May, June, and July 2013 using separate rent checks. (Carl Tr. at 33:24-34:9, May 25, 2017.)

65. The check was deposited into Norris Hancock's account at Washington Savings Bank, and a large portion of the money then was transferred to Defendant's personal bank account. (Carl Tr. at 78:22-25, June 12, 2017.) IRS Special Agent Joseph Carl testified that between Norris Hancock's account and Defendant's account, the money was spent on credit cards, utilities, and loan payments, and some of it was withdrawn in cash. (Id. at 78:25-79:3.)

66. The $150,000 check is the basis for Counts 10, 31, and 43 in the Indictment. (Doc. No. 3.) The jury convicted Defendant on the charges set forth in each of these counts.

67. The Court finds that the $150,000 check was paid to Norris Hancock, used by Defendant, and not returned to JCMHC.

### v.  Defendant Acquired $522,000 in Proceeds from Above-Market Rent and the Rent Deposit for the 5th Street Building

68.  The money that Defendant obtained from the 5th Street Building is derived from two sources: (1) $372,000 in above-market rent, and (2) the $150,000 rent deposit.

69.  First, Defendant acquired $372,000 in above-market rent through Norris Hancock for the 5th Street Building.  From December 2012 to February 2015, JCMHC paid $324,000 more in rent than if it had been paying market rent of $23,000 per month.  (Carl Tr. at 139:1-9, June 13, 2017.)  From March 2015 to October 2015, JCMHC paid $48,000 more in rent for March, April, May, and June than if it had been paying market rent of $23,000 per month.  (Ex. G-19E; Forfeiture Hr'g Ex. G-2; DiFrancesco Tr. at 20:4-21:3, Jan. 18, 2018.)  The $372,000 amount is the difference between the $35,000 paid in rent and the $23,000 fair market rent from December 2012 to June 2015.

70.  Second, JCMHC paid Norris Hancock $150,000 as a rent deposit that was not applied to rent and was never returned to JCMHC.

71.  These two sources together total $522,000 that Defendant obtained from JCMHC for the 5th Street Building.[18]

---

[18]  Defendant contends that the Court should decrease the total amount of money she acquired in rent from the 5th Street Building by $394,000.  (Doc. No. 197 at 22-23.)  She asserts that she paid $115,000 in taxes on behalf of JCMHC in 2015, loaned $20,000 to JCMHC to make payroll, and Norris Hancock was not paid rent from May to December 2016.  (Id. at 23.)  She states that the total of these three categories supports an offset of $394,000.

Defendant offered the testimony of Michael Wright, an administrator at JCMHC from June 2014 to November 2016.  (Wright Tr. at 8:10-25, Jan. 19, 2018.)  He testified at the forfeiture hearing that from May to December 2016, JCMHC did not pay rent to Norris Hancock, resulting in $259,000 in unpaid rent.  (Id. at 10:16-24.)  He further stated that based on information given to him by Defendant and Matos, Defendant paid $115,000 in taxes for JCMHC.  (Id. at 11:1-6.)  Finally, he testified that Defendant loaned the clinic $20,000 for payroll.  (Id. at 11:6-10.)  During his testimony, Wright referred to a chart he had created to

### 3. Defendant Acquired $599,000 in Proceeds from Construction Costs Funded by JCMHC for the 5th Street Building

72.     Before JCMHC paid Norris Hancock the $150,000 deposit, JCMHC began to pay to renovate the 5th Street Building. (S. Acosta Tr. at 97:14-17, May 31, 2017.)

73.     Although JCMHC did not own the 5th Street Building, checks from JCMHC to Norris Hancock from 2010 through 2013 reveal that JCMHC spent $599,000 on construction costs.[19] (Exs. G-19F, G-19G, G-118A to G-118C; Carl Tr. at 92:20-23, June 13, 2017.) This amount does not include the $150,000 deposit that JCMHC paid Norris Hancock. (Carl Tr. at 79:10-12. June 12, 2017.)

74.     The JCMHC Board of Directors did not approve using JCMHC's funds to renovate the 5th Street Building.[20] (S. Acosta Tr. at 98:6-11, May 31, 2017.) David Rosario

---

reflect these amounts. (Doc. No. 197-10.)

Other than the chart that Wright created, he did not offer any documentation to support the amounts to which he testified. Moreover, he never saw any documentation to support the claim that Defendant paid $115,000 for JCMHC's taxes. Instead, he said he was told about the payment by Defendant. (Wright Tr. at 13:17-20, Jan. 19, 2018.) As discussed below, Defendant will not be given credit for these amounts towards the required forfeiture.

[19]   Construction payments totaling $599,000 are supported by JCMHC's Washington Savings Bank and Hyperion Bank records. (Exs. G-19F, G-19G, G-118A to G-118C.) Agent Carl arrived at $599,000 by totaling checks that JCMHC issued for construction costs.

Defendant asserts that the correct amount JCMHC spent on renovations was $377,000. (Doc. No. 197 at 23.) She supports this assertion with the testimony of Geoffrey Johnson, JCMHC's former attorney. (Doc. No. 197-4.) For 2010, 2011, and 2012, however, the ledger that Johnson referred to during his testimony reveals that JCMHC actually spent $464,979 in construction costs. (Id.) This number does not include funds spent in 2013.

For these reasons, the Court does not credit the testimony of Johnson or the evidence relied upon by Johnson in calculating construction costs paid by JCMHC.

[20]   Defendant argues that the Board of Directors considered and adopted a Resolution approving expenditures for the 5th Street Building. (Doc. No. 197 at 23.) However, when asked about the Resolution, Sandy Acosta stated that she did not create the Resolution and played no role in its creation. (S. Acosta Tr. at 100:20-23, May 31, 2017.) In addition, members of the

testified that as a member of the Board, he never voted on whether JCMHC should lend money to Norris Hancock to fix up the 5th Street Building. (Rosario Tr. at 103:4-18, June 5, 2017.) In addition, Sandy Acosta fabricated Board meeting minutes at the direction of Defendant and Matos to falsely reflect that Defendant had informed the Board about the need for JCMHC to loan Norris Hancock funds to begin renovations. (Ex. G-528 at 6-7; S. Acosta Tr. 118:5-18, May 31, 2017.)

75.     Based on the evidence, the Court finds that JCMHC contributed $599,000 to construction costs for the 5th Street Building, which was never reimbursed.

### 4.     Defendant Acquired $305,750 in Proceeds from JCMHC Through a Check-Cashing Scheme Involving Sandy and Leslie Acosta

76.     While Sandy Acosta was an administrator at JCMHC, she would write checks on behalf of JCMHC to herself for money that she did not earn. (S. Acosta Tr. at 120:22-121:2, May 31, 2017.) Defendant would sign the majority of the checks on behalf of JCMHC. (Id. at 122:6-10.) Sandy then would cash each check and would give the cash to Defendant. (Id. at 121:2-4.)

77.     Sandy asked her daughter, Leslie Acosta, to assist in cashing checks for Defendant. (Id. at 122:18, 24; 123:1-7.) Like her mother, Leslie would take each JCMHC check to Washington Savings Bank, would cash the check, and would put the money in an envelope for Defendant. (L. Acosta Tr. at 26:14-21, June 6, 2017.) She then would give the envelope to her mother, Sandy, who would combine the money in the envelope with the money that she had obtained by cashing checks for Defendant.[21] (Id. at 28:9-12.)

---

JCMHC Board testified that they did not approve expenditures to renovate the 5th Street Building.

[21]     Amalia Rodriguez and her two children also were involved in the process of cashing checks. (S. Acosta Tr. at 122:18-23, May 31, 2017.)

78. The money from the cashed checks was given to Defendant. (S. Acosta Tr. at 123:20-124:10, May 31, 2017.) To inform Defendant that she had cashed a check, Sandy would use code language by telling her that "the letters were ready for her signature." (Id. at 124:4-10.)

79. Sandy testified that the check-cashing process fell into a pattern. (Id. at 124:13.) The checks were cashed every fifteen days for the same amount of money. (Id. at 124:15-16.) Often, checks issued on the same day to Sandy and Leslie would be payable in amounts ending in the numbers 22 and 78 so that the total of the two checks would add up to a round number. (See, e.g., Exs. G-172; G-154; G-158; G-750; S. Acosta Tr. at 127:3-136:20, May 31, 2017; L. Acosta Tr. at 32:12-33:2, June 6, 2017.)

80. Engaging in this check-cashing scheme caused Sandy and Leslie to owe income taxes because, by having these cashed checks made out to them, it appeared as though they earned the money at JCMHC. (S. Acosta Tr. at 137:11-18, May 31, 2017.) To remedy this problem, Defendant authorized JCMHC to pay Leslie's tax liability. (Ex. G-135C; S. Acosta Tr. at 138:9-139:8, May 31, 2017; L. Acosta Tr. at 65:17-25, June 6, 2017.)

81. Defendant's expert witness, Kyle Midkiff, a forensic accountant, created a spreadsheet of sixty-two checks that she identified as having been altered in both the number and the wording of the check. (Doc. No. 207-2; Midkiff Tr. at 28:1-3, June 19, 2017; Midkiff Tr. at 8:1-10, June 20, 2017.) Five of these altered checks were checks that the Government alleges were part of the check-cashing scheme. (Doc. No. 207-2.) These five altered checks total $13,222.[22] (Id.)

---

[22] Of the sixty-two checks that Midkiff identified as being altered, the following five checks were checks that the Government asserts are direct proceeds to Defendant: Check 2994 dated October 24, 2008 to Leslie Acosta; Check 2995 dated October 24, 2008 to Sandy Acosta; Check 3158 dated December 19, 2008 to Sandy Acosta; Check 1025 dated January 30, 2009

82.     The checks were altered by using a typewriter to add numbers to increase the numerical amount and to add words to increase the written amount on the checks. (Midkiff Tr. at 28:7-15, June 19, 2017.) Midkiff determined that these checks were altered because the numbers and the words on the checks were not aligned properly, were in the margin of the check, or were crooked. (Id.) For this reason, the Court will not rely on these checks as proceeds to Defendant from her scheme to defraud.

83.     Additionally, seven checks that the Government includes in the check-cashing scheme actually were deposited into the accounts of Sandy and Leslie Acosta.[23] At trial, Midkiff identified as examples two checks ending in 22 and 78 from the Government's spreadsheet which listed checks that had been deposited into their recipients' accounts rather than cashed. First, check 5613 dated December 17, 2010 for $2,778 from JCMHC to Leslie Acosta was deposited into her personal account at TD Bank. (Exs. D-76; G-65 at 10; Midkiff Tr. at 50:9-16, June 20, 2017.) Second, check 5612 dated December 17, 2010 for $2,722 from JCMHC to Sandy Acosta was deposited into her personal account at TD Bank.[24] (Ex. D-77; Midkiff Tr. at 53:23-54:7.) The seven deposited checks ending in 22 and 78 total $20,278.

_____

to Sandy Acosta; and Check 1035 dated March 26, 2009 to Leslie Acosta. (Doc. No. 207-2; Ex. G-100 at 557, 4476, 4520, 6251, 10615.)

[23]   The seven checks ending in 22 and 78 that were deposited rather than cashed are as follows: Check 5337, October 22, 2010 to Sandy Acosta; Check 5338, October 22, 2010 to Leslie Acosta; Check 5489, November 19, 2010 to Sandy Acosta; Check 5490, November 19, 2010 to Leslie Acosta; Check 5541, December 3, 2010 to Sandy Acosta; Check 5542, December 3, 2010 to Leslie Acosta; Check 5612, December 17, 2010 to Sandy Acosta; Check 5613, December 17, 2010 to Leslie Acosta. (Doc. No. 210-1 at 2.)

[24]   The Government argues that the fact that some checks were deposited rather than cashed does not prove that the money was not transmitted to Defendant. On cross-examination, the Government raised this inference by asking Midkiff whether it was possible that Sandy or Leslie Acosta may have still had cash on hand to give to Defendant after depositing a check. (Midkiff Tr. at 121:12-15, June 20, 2017.) Although the Government contends that this money later was transmitted to Defendant after it initially was deposited, the Government has

84.     Based on the testimony of forensic accountant Midkiff, the Government has not proven that the funds sourced from the five altered checks totaling $13,222 and seven deposited checks totaling $20,278 were transmitted to Defendant.  Except for the five altered checks and the seven deposited checks, the balance of the checks cashed by Sandy and Leslie Acosta were given to Defendant through the check-cashing scheme.

85.     Thus, Defendant acquired $305,750 total from the checks cashed by Sandy and Leslie Acosta.  This amount represents the total of the subset of checks for amounts ending in the numbers 22 and 78 identified by the Government ($339,250) less the value of the five altered checks and the seven deposited checks identified by Midkiff ($33,500).

**B.     The 5th Street Building Appreciated in Value by $1,126,000, with $360,100 of this Appreciation Attributable to Construction Costs Paid by JCMHC**

86.     As noted, on December 1, 2011, Norris Hancock purchased the 5th Street Building from Candelario Lamboy for $650,000.  (Ex. G-80; Carl Tr. at 137:5-10, June 13, 2017; Lamboy Tr. at 10:20-24, June 16, 2017.)

87.     After Defendant and Matos had sold another building that they owned, they were able to purchase the 5th Street Building by borrowing $300,000 and having a mortgage in this amount placed on the 5th Street Building.  They made monthly mortgage payments.  (Forfeiture Hr'g Ex. G-7 at 2; Lamboy Tr. at 11:4-25, June 16, 2017.)

88.     The Court finds that Defendant paid the mortgage with her own money.[25]

---

not proven by a preponderance of the evidence that the proceeds of these seven checks were received by Defendant.

[25]     The Government argues it has traced $210,813 in criminal proceeds from rent checks paid by JCMHC to Norris Hancock to mortgage payments that Defendant made on the 5th Street Building.  (Doc. No. 177 at 17.)  To support this argument, litigation financial analyst, Joseph Piccione, testified at the forfeiture hearing that he reviewed all bank records related to Defendant and JCMHC and attempted to trace rent checks that JCMHC paid Norris Hancock

89.     In addition to purchasing the 5th Street Building, Defendant's tax returns reveal that she spent $625,000 of her own money on renovations to the building. (Carl Tr. at 92:24-93:2, June 13, 2017.) As such, the proportion of the 5th Street Building attributable to Defendant's untainted investment is $1,275,000—the sum of the $650,000 purchase price and the $625,000 spent on renovations.

90.     Although JCMHC did not own the 5th Street Building, from 2010 through 2013 JCMHC spent $599,000, which the Board of Directors did not approve, on construction costs to renovate the building. (Exs. G-19F, G-19G, G-118A to G-118C; Carl Tr. at 92:20-23, June 13, 2017; S. Acosta Tr. at 98:6-11, May 31, 2017.)

91.     Adding together the $1,275,000 that Defendant invested and the $599,000 that JCMHC spent on renovations, the total investment in the 5th Street Building was $1,874,000.

---

to payments that Defendant made on the 5th Street Building's mortgage. (Piccione Tr. at 110:19-25, 111:22-112:19; 113:3-5; 125:6-126:8, Jan. 18, 2018.)

He did so by applying to mortgage payments made on the 5th Street Building the excess rent above the market rent sourced from rent checks deposited into Norris Hancock's accounts. (Id. at 125:6-128:1.) If, in the interim between the deposit of the rent check and the mortgage payment, the balance in Defendant's account fell below the amount of excess rent, Piccione would only apply the amount of excess rent in the account to the mortgage payments. (Id. at 126:9-128:1.)

The Court is not persuaded that the Government has sufficiently traced proceeds from above-market rent checks to mortgage payments on the 5th Street building. The funds from excess rent checks in Defendant's account were commingled with other funds, and the proceeds in the account were diluted by intervening deposits and withdrawals. For example, Piccione testified that on one occasion, $700,000 was transferred from a personal account into the account of Norris Hancock, which was the account from which Piccione was tracing funds used to pay down the mortgage. (Id. at 144:5-9.) In addition, Piccione testified that the commingling made it difficult for him to establish a nexus between the criminal proceeds and the mortgage payments.

Thus, as will be discussed more fully in the Conclusions of Law, the Government has not proven that Defendant made mortgage payments with proceeds from above-market rent.

92.     On June 29, 2017, the 5th Street Building was sold for $3,000,000.  (Doc. No. 177-3.)  Thus, the 5th Street Building appreciated in value, and it was sold for $1,126,000 over the amount that had been invested.  This $1,126,000 is the difference between the sale price and the total investment in the 5th Street Building, which includes acquisition and renovation costs.

93.     Of this $1,126,000 in appreciation, $360,100 is criminal proceeds because that amount is the appreciation on the proportion of the value of the building attributable to the $599,000 in construction costs paid by JCMHC.  As such, $360,100 in appreciation was acquired by Defendant as a result of her crimes.

**C.     Defendant Acquired a Total of $2,401,850 in Criminal Proceeds as a Result of Her Scheme to Defraud JCMHC**

94.     As noted, as part of her scheme to defraud JCMHC, Defendant acquired money from JCMHC in several ways.  First, she acquired $615,000 in above-market rent, extra months' rent, and a rent deposit from JCMHC for use of the 3rd Street Building.

95.     Second, Defendant acquired $522,000 from JCMHC in above-market rent and an unauthorized rent deposit for the 5th Street Building.

96.     Third, she acquired $599,000 from JCMHC in the form of unauthorized payments made for construction costs to renovate the 5th Street Building.

97.     Fourth, she obtained $305,750 from JCMHC through a check-cashing scheme involving Sandy and Leslie Acosta.  Accordingly, from these four sources, Defendant acquired $2,041,750.

98.     Defendant also indirectly acquired $360,100 from the appreciation on the 5th Street Building.  These proceeds are the appreciation on the proportion of the building attributable to $599,000 that JCMHC paid for construction costs.  Because $599,000 is proceeds

that Defendant acquired as part of her scheme, so too is the proportional appreciation on that amount.

99.     In sum, Defendant acquired a total of $2,401,850 in proceeds from her scheme to defraud JCMHC.  This amount is the total of above-market rent, excess rent, and unauthorized rent deposits for the 3rd and 5th Street Buildings, as well as construction costs to renovate the 5th Street Building and a check-cashing scheme.  All of this money was taken from the coffers of JCMHC.

### D.     Defendant Engaged in Banking Practices that Prevented the Government from Tracing Money that She Acquired

100.     Defendant engaged in banking practices that prevented the Government from tracing proceeds that she had obtained as the result of her offenses into assets with a nexus to the illegal conduct.

101.     As noted above, one such practice was that Defendant used the check-cashing company, J&R Check Cashing, to cash checks from JCMHC to Norris Hancock.  (Ex. G-89; Carl Tr. at 33:1-4, June 13, 2017.)

102.     In addition, Defendant would split checks from JCMHC to Norris Hancock by depositing a portion of the check into Norris Hancock's business account and a portion into her personal account.  Her conduct in depositing checks into both business and personal accounts resulted in commingling of money from JCMHC with her other money.  (Piccione Tr. at 146:9-16, Jan. 18, 2018.)

103.     Defendant also would receive funds in cash.  (Carl Tr. at 40:12-15, June 13, 2017.) And Joseph Piccione, a litigation financial analyst, testified that Defendant withdrew cash from her accounts, making it impossible to trace once it had been withdrawn.  (Piccione Tr. at 130:11-25, Jan. 18, 2018.)  For example, Piccione testified that upon review of the Norris

Hancock checking account ending in 1863, he identified $300,000 that Defendant withdrew in cash. (Id. at 130:11-15.)

104. Defendant regularly transferred funds between her accounts. (Doc. No. 177-2 ¶ 6; Piccione Tr. at 131:13-16, Jan. 18, 2018.) For example, from May 2009 to approximately October 2012, Defendant transferred over $290,000 from the Norris Hancock checking account ending in 1863 to her personal account ending in 7812. (Piccione Tr. at 131:22-132:3, Jan. 19, 2018.) And from her personal account ending in 3298, Defendant transferred just over $700,000 to the Norris Hancock account ending in 1863. (Id. at 132:9-14.)

105. Defendant's transferring of funds between accounts, comingling of funds, and other banking practices made it difficult to trace tainted funds into assets. (Id. at 132:15-18; 150:8-10.)

106. Finally, as previously discussed, Defendant acquired funds in cash from the check-cashing scheme involving Sandy and Leslie Acosta, making tracing of those funds impossible.

107. Accordingly, based on the evidence presented, Defendant engaged in banking practices that prevented the Government from tracing money.

## IV. LEGAL STANDARD

Federal Rule of Criminal Procedure 32.2 provides that as soon as practical after a guilty verdict, "on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute." Fed. R. Crim. P. 32.2(b)(1)(A). As to a personal money judgment, "the court must determine the amount of money that the defendant will be ordered to pay." Id. As to forfeiture of specific property, "the court must determine whether the government has established the requisite nexus between the property and the offense." Id. Rule 32.2(b)(1) continues:

> The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty.

Fed. R. Crim. P. 32.2(b)(1)(B). The government has the burden of proving its right to forfeiture by a preponderance of the evidence. United States v. Voigt, 89 F.3d 1050, 1083 (3d Cir. 1996).

Rule 32.2 continues: "If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria." Fed. R. Crim. P. 32.2(b)(2)(A).

## V. CONCLUSIONS OF LAW[26]

After trial, the jury convicted Defendant of each count in the fifty-three count Indictment. As noted earlier, Defendant was convicted of the following offenses:

- Conspiracy to Commit Mail Fraud, Wire Fraud, Theft from a Health Care Benefit Program, and Theft from a Program Receiving Federal Funds in Excess of $10,000, in violation of 18 U.S.C. § 371 (Count 1);

- Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1349 (Counts 2-13);

- Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (Counts 14-25);

- Theft from a Health Care Benefit Program, in violation of 18 U.S.C. § 669 (Counts 26-37);

- Theft from a Program Receiving Federal Funds in Excess of $10,000, in violation of 18 U.S.C. § 666 (Counts 38-49); and

---

[26] Defendant has challenged practically every theory of forfeiture and the amount to be forfeited in this case. The Court does not find in favor of Defendant on many of her claims and has only noted in this Opinion where the Court agrees with Defendant's position. When so doing, Defendant's position is adopted as a finding of fact.

- False Statements on Tax Returns, in violation of 26 U.S.C. § 7206(1) (Counts 50-53).

The Government included a Notice of Forfeiture in the Indictment (Doc. No. 3 at 31) and filed a Bill of Particulars for Forfeitable Property[27] (Doc. No. 13).

The Government now moves for a preliminary order of forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), seeking forfeiture of proceeds from the offenses charged in Counts 1 to 49. 18 U.S.C. § 981, which governs civil forfeiture, provides that "property is subject to forfeiture to the United States" where it "constitutes or is derived from proceeds traceable to a violation of [certain enumerated offenses] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." § 981(a)(1)(C). In addition, 28 U.S.C. § 2461 provides:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to to [sic] the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding . . . .

18 U.S.C. § 2461(c). The offenses of mail and wire fraud, theft from a healthcare benefit program, and theft from a program receiving federal funds in excess of $10,000 all are included in the definition of "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7).[28] See

---

[27] Federal Rule of Criminal Procedure 32.2(a) provides:

> A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment . . . contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute. . . .

Fed. R. Crim. P. 32.2(a).

[28] 18 U.S.C. §1956(c)(7) provides in relevant part as follows:

United States v. Vampire Nation, 451 F.3d 189, 200 (3d Cir. 2006) ("[W]e read the plain language of § 2461(c), by virtue of the chain of cross-reference leading to § 1956(c)(7) and § 1961(1), to explicitly permit criminal forfeiture for general mail fraud, not just for mail fraud against financial institutions." (emphasis in original)).

A defendant must forfeit the proceeds of her offenses. § 981(a)(1)(C); Fed. R. Crim. P. 32.2. In 18 U.S.C. § 981(a)(2)(A), "proceeds" is defined as follows:

> In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.

§ 981(a)(2)(A).

Here, the Government seeks as forfeitable assets a personal money judgment, specific property that it claims has a sufficient nexus to the offenses, and substitute assets to which it claims that it is entitled as a result of Defendant's banking conduct that prevented tracing of funds. Thus, in accordance with Federal Rule of Criminal Procedure 32.2, the Court must

---

**(7)** the term "specified unlawful activity" means—

> **(A)** any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31; . . . .

§ 1956(c)(7)(A). Each offense charged in Counts 1 to 49 is listed in 18 U.S.C. § 1961(1).

The offense of theft from a healthcare benefit program also is included as an offense in which a forfeiture under 18 U.S.C. § 982(a)(7) may be ordered. Section 982(a)(7) provides:

> **(7)** The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

§ 982(a)(7). The Government notes that it is only proceeding under § 981(a)(1)(C), however. (Doc. No. 177 at 5 n.4.)

determine the amount of Defendant's criminal proceeds, whether the proceeds can be traced into assets with a nexus to the crimes, and whether substitute assets are forfeitable.

### A. Defendant Must Forfeit a Personal Money Judgment of $2,041,750 as Gross Proceeds Directly Obtained as the Result of Her Crimes

The Government submits that Defendant obtained her fraudulent proceeds in this case from four sources: (1) above-market and excessive rent and the $15,000 rent deposit for the 3rd Street Building; (2) above-market rent and the $150,000 rent deposit for the 5th Street Building; (3) construction payments for the 5th Street Building; and (4) cash acquired from the check-cashing scheme. (Doc. No. 177 at 10.) The Government contends that Defendant's gross proceeds from these four sources total $2,075,250.

As noted, "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." § 981(a)(2)(A). In Honeycutt v. United States, the Supreme Court held: "Forfeiture . . . is limited to property the defendant [herself] actually acquired as the result of the crime." 137 S. Ct. 1626, 1635 (2017); accord United States v. Gjeli, 867 F.3d 418, 427-28 (3d Cir. 2017) (concluding that Honeycutt applies to forfeiture under § 981(a)(1)(C)). "[A]n in personam forfeiture judgment may be entered for the full amount of the criminal proceeds." Vampire Nation, 451 F.3d at 201-02.

Forfeiture applies to proceeds from the entire scheme when the government proves the amount of proceeds by a preponderance of the evidence. See, e.g., United States v. Lo, 839 F.3d 792-94 (9th Cir. 2016) (holding that forfeiture money judgment in amount of proceeds obtained as a result of two fraudulent schemes was proper even though defendant only pled guilty to certain counts in the indictment); United States v. Jafari, 663 F. App'x 18, 23-24 (2d Cir. 2016) (holding that forfeiture after conviction for health care fraud correctly included uncharged and

acquitted conduct where the government proved the conduct by a preponderance of the evidence); United States v. Venturella, 585 F.3d 1013, 1017 (7th Cir. 2009) (concluding that forfeiture pursuant to § 981 for mail fraud "is not limited solely to the amounts alleged in the count(s) of conviction" but includes the "total amount gained by the crime or criminal scheme").

Even when proceeds are received through an intermediary or a corporate entity, a defendant still receives the proceeds for purposes of forfeiture, given that forfeitable property may be obtained directly or indirectly. See, e.g., Honeycutt, 137 S. Ct. at 1633 (noting that a defendant that receives payments through an intermediary still "obtains" the property); United States v. Peters, 732 F.3d 93, 102-03 (2d Cir. 2013) (holding that defendant "indirectly" obtained the proceeds through his companies, rendering him liable for forfeiture).

For reasons that follow, the Court concludes that the Government has proven by a preponderance of the evidence that Defendant directly received $2,041,750 in criminal proceeds.

### 1. Defendant Acquired $615,000 in Criminal Proceeds from the 3rd Street Building

The Government submits that Defendant acquired at least $615,000 in criminal proceeds from above-market rent, the four extra rent payments, and the $15,000 rent deposit JCMHC paid to Norris Hancock for the 3rd Street Building. (Doc. No. 177 at 10-11.) The Court agrees.

First, the Government has proven that Defendant acquired $535,000 in criminal proceeds from charging JCMHC above-market rent through her solely-owned company, Norris Hancock. In early 2006, when JCMHC moved to the 3rd Street Building, JCMHC paid $4,500 per month in rent to the building's landlord, Daniel Labrador. (Exs. G-114 at 3-11; G-115; G-538A; Carl Tr. at 79, 82, May 24, 2017.) Then, in May 2007, after Defendant purchased the 3rd Street Building from Labrador, she increased the rent, and JCMHC began to pay $7,500 per month in rent to Defendant. (Exs. G-2; G-514; Carl Tr. at 74-75, May 24, 2017.) Thereafter, JCMHC paid

rent to Norris Hancock. (G-117A to G-117F; G-4: Carl Tr. at 97-99, 108, 136-37, May 24, 2017.) Over the next three years, the rent for the 3rd Street Building increased. In 2009, the rent increased to $10,000; in 2010, through Defendant's actions, the rent increased to $15,000; and in 2011, the rent increased to $25,000. (G-117A to G-117E.)

At trial, real estate appraiser, George Hoez, testified that the fair market rent for the 3rd Street Building was $4,500 from May 2007 to January 2010, and $4,800 from February 2010 to January 2013. (Exs. G-403 at 15; G-403A; Hoez Tr. at 40:5-7, May 30, 2017.) He arrived at his conclusion by comparing the 3rd Street Building with comparable buildings in the area, considering adjustments like size, location, and expenses. (Exs. G-403 at 28; Hoez Tr. at 38:3-8; 86:16, May 30, 2017.) He also inspected the interior of the 3rd Street Building. (Hoez Tr. at 88:15-89:24, May 30, 2017.) The Court finds the testimony of Hoez to be credible and concludes that the Government has proven fair market rent by a preponderance of the evidence.

Second, Washington Savings Bank records reveal that from 2010 to 2012, JCMHC paid Norris Hancock four extra monthly rent checks for months beyond twelve in certain years. (Exs. G-117D to G-117F; G-701; Carl Tr. at 149-51, May 24, 2017.) This rent money was not owed and totaled $65,000. (Id.) Sandy Acosta testified that these rent checks were never credited to JCMHC for rent. (S. Acosta Tr. at 106:22-107:15, May 31, 2017.)

Finally, JCMHC paid Norris Hancock $15,000 as an office rent deposit that was never returned. IRS Special Agent Joseph Carl, assigned to investigate this case, testified that this $15,000 was spent by Defendant on personal expenses. (Carl Tr. at 32:20-25, June 13, 2017.)

The Court therefore finds that the Government has proven by a preponderance of the evidence that Defendant acquired $615,000 in criminal proceeds from her fraudulent scheme regarding the 3rd Street Building. She received $535,000 in above-market rent—the difference

between actual rent and fair market rent, excluding rent for October 2008. She received $65,000 from extra rent checks. And she received $15,000 from the rent deposit that was never returned. The evidence presented proved that Defendant acquired all of these funds as a result of her fraudulent conduct. See Honeycutt, 137 S. Ct. at 1635.

Moreover, ten of the above-market rent checks that JCMHC paid Norris Hancock for use of the 3rd Street Building form the basis of Counts in the Indictment. Of these ten checks, two checks are charged as mail fraud, theft from a healthcare benefit program, and theft from a program receiving federal funds. Seven of the ten checks are charged as mail fraud. And one of the ten checks is charged as a theft from a health care benefits program. Additionally, two of the excess rent checks were charged as mail fraud, and one of these checks also was charged as theft from a healthcare benefit program and theft from a program receiving federal funds. The jury convicted Defendant of the offenses charged in each of these counts.

Accordingly, because Defendant's proceeds from the 3rd Street Building were obtained "as a result of the commission" of the offenses charged in the Indictment, the Government is entitled to forfeiture of $615,000. See, e.g., Lo, 839 F.3d at 793 ("Because the proceeds from a mail fraud or wire fraud offense include funds obtained 'as the result of the commission of the offense,' and the commission of such . . . offense necessarily includes a fraudulent scheme as a whole, the proceeds of the crime of conviction consist of the funds involved in that fraudulent scheme, including additional executions of the scheme that were not specifically charged . . . .").

## 2. Defendant Acquired $522,000 in Criminal Proceeds from Above-Market Rent and the Rent Deposit for the 5th Street Building

Next, the Government submits that Defendant acquired at least $522,000 in criminal proceeds from above-market rent and the $150,000 rent deposit that JCMHC paid to Norris Hancock for the 5th Street Building. (Doc. No. 177 at 12-13.) The Court agrees.

First, the Government has proven by a preponderance of the evidence that Defendant obtained $372,000 in above-market rent through Norris Hancock for the 5th Street Building. As noted, beginning in December 2012, JCMHC paid $35,000 in monthly rent to Norris Hancock. (Exs. G-19B to G-19E; G-135O to G-135X; Carl Tr. at 139:1-6, June 13, 2017.) At trial, real estate appraiser, Anthony Salvitti, Jr., testified that during the time that JCMHC rented the 5th Street Building, the fair market rent was $23,000. (Salvitti Tr. at 45:21-46:10, June 7, 2017.) To determine this value, Salvitti assumed that the fourth and fifth floors would be fully renovated and compared the terms of the lease with three comparable buildings. (Id. at 23:12-14; 31:19-21; 46:6-15.) The Court credits the testimony of Salvitti and concludes that the Government has proven that $23,000 was the fair market rent of the 5th Street Building, not the $35,000 charged by Norris Hancock.

Second, the Government has proven that Defendant acquired $150,000 in criminal proceeds from a rent deposit that was never returned to JCMHC. JCMHC paid Norris Hancock $150,000, which was labeled on the check as a rent deposit and was labeled on the rent stub as rent for May, June, and July. (Exs. G-117F at 5; G-538A at 44; Carl Tr. 30:22-31:20, May 25, 2017.) However, Agent Carl testified that the check was deposited into Norris Hancock's account, a portion was transferred to Defendant's personal bank account, and the money was spent on personal expenses. (Carl Tr. at 78:22-25, June 12, 2017.)

Accordingly, the Government has proven by a preponderance of the evidence that Defendant acquired $522,000 in criminal proceeds from the 5th Street Building. She received $370,000 in unauthorized above-market rent—the difference between the $35,000 paid and the $23,000 fair market rent. And she received $150,000 from a rent deposit that was not returned.

The bank records, trial testimony, and documentary evidence show that Defendant "actually acquired" this money "as the result of her crime." Honeycutt, 137 S. Ct. at 1635.

In addition, eleven of the above-market rent checks form the basis of counts in the Indictment. Of these eleven checks, five are charged as wire fraud, theft from a health care benefit program, and theft from a program receiving federal funds. Six checks are charged as wire fraud. The $150,000 rent deposit is charged as mail fraud, theft from a health care benefit program, and theft from a program receiving federal funds. Defendant was convicted of each of these offenses. Thus, the Court concludes that the above-market rent payments and rent deposit were part of Defendant's criminal scheme, and $522,000 is forfeitable criminal proceeds.[29]

---

[29] Defendant argues that criminal proceeds from the 5th Street Building should be offset, or reduced, by $394,000. (Doc. No. 197 at 22-23.) She contends that in 2015, she paid $115,000 of JCMHC's taxes, that she loaned JCMHC $20,000 for payroll, and that in 2016, Norris Hancock was not paid rent—resulting in a total of $394,000. (Id. at 23.)

Where the operative forfeiture statute requires forfeiture of gross proceeds, courts have not allowed a reduction in forfeiture for expenses or other payments made. See, e.g., United States v. Jafari, 85 F. Supp. 3d 679, 687 (W.D.N.Y. 2015) (holding that defendant was not entitled to a set-off for value of services he actually provided for purposes of determining forfeitable gross proceeds in healthcare fraud under 18 U.S.C. § 982(a)(7)), aff'd, 663 F. App'x 18 (2d Cir. 2016); United States v. Pinson, No. 3:12-cr-00974, 2015 WL 1578726, at *6 (D.S.C. Aug. 9, 2015) (holding that defendant was not entitled to an offset for developer fees he never received under a contract because government was entitled to gross proceeds of the criminal enterprise and not just profits); United States v. Sigillito, 899 F. Supp. 2d 850, 865 (E.D. Mo. 2012) (concluding that under definition of proceeds in § 981(a)(2)(A), forfeiture was not limited to net gain and defendant was not entitled to a deduction for costs incurred), aff'd, 759 F.3d 913 (8th Cir. 2014); United States v. Jarrett, 803 F. Supp. 2d 938, 944-45 (N.D. Ind. 2011) (holding that proceeds were "gross proceeds" for purposes of forfeiture, and that defendant was not entitled to a reduction for taxes paid).

Here, no credible evidence shows that Defendant paid JCMHC's taxes, lent it money for payroll, or was owed rent. She supports her claim to offsets with the testimony of Michael Wright, an administrator at JCMHC, who testified that from May to December 2016, JCMHC did not pay $259,000 owed in rent to Norris Hancock and that Defendant paid taxes for JCMHC and loaned it $20,000 for payroll. (Wright Tr. at 8:10-25; 10:16-11:10, Jan. 19, 2018.) Wright did not offer any documentation to support these amounts other than a summary chart he prepared. (Id. at 13:17-20.) The evidence does not show that she is

### 3.  Defendant Acquired $599,000 in Proceeds from Construction Costs Funded by JCMHC for the 5th Street Building

The Government asserts that Defendant acquired $599,000 in criminal proceeds from money that she caused JCMHC to spend to renovate the 5th Street Building, which expenditure was not authorized by the Board of Directors.  (Doc. No. 177 at 14.)  The Court agrees.

After reviewing checks from JCMHC, Agent Carl testified that JCMHC spent $599,000 on construction costs for the 5th Street Building.  (Exs. G-19F, G-19G, G-118A to G-118C; Carl Tr. at 92:20-23, June 13, 2017.)  The Board did not approve this amount.

Moreover, the Indictment alleges in Count 1 that it was part of the conspiracy that beginning in July 2010, Defendant caused JCMHC to pay for repairs and renovations to the 5th Street Building that the JCMHC Board did not approve.  (Doc. No. 3 at 9, ¶ 50.)  Defendant was convicted of the conspiracy charge. Accordingly, the Court finds that, as part of the conspiracy, Defendant obtained $599,000 in criminal proceeds from money spent by JCMHC to renovate the 5th Street Building, and this amount is forfeitable to the Government.

---

entitled to offsets for these funds.

But even if she had made these payments, proceeds in this case are defined as gross proceeds under § 981(a)(2)(A), and Defendant would not be entitled to an offset.  Proceeds is defined in § 981(a)(2)(A) as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  § 981(a)(2)(A) (emphasis added); see also United States v. George, -- F.3d --, 2018 WL 1444332, at *6 (1st Cir. 2018) (comparing § 981(a)(2)(A) with § 981(a)(2)(B), noting that "it is readily apparent that the classification of an offense of conviction can have a profound effect on the amount that may be subject to forfeiture in a particular case").  As such, the relevant statutory provision in this case clearly does not account for potential offsets.  See Sigillito, 899 F. Supp. 2d at 865 (concluding that proceeds under § 981(a)(2)(A) were not limited to net gain and defendant was not entitled to a deduction for money returned to investors).  Thus, Defendant will not be granted an offset against the amount she must forfeit here.

### 4.    Defendant Acquired $305,750 in Criminal Proceeds from Cash Produced by the Check-Cashing Scheme

The Government contends that Defendant acquired $339,250 in criminal proceeds from unearned checks that she caused JCMHC to issue to Sandy and Leslie Acosta, and that they cashed the checks and gave the money to Defendant. (Doc. No. 177 at 14.) The Court concludes that Defendant obtained $305,750 in criminal proceeds from the check-cashing scheme rather than the $339,250 which the Government contends is the correct amount. The reason for the difference is that the evidence shows that five checks were altered and seven checks actually were deposited into Sandy and Leslie Acosta's accounts rather than cashed. The altered and cashed checks cannot be relied on to establish forfeitable proceeds.

As noted, Sandy and Leslie engaged in a check-cashing scheme in which JCMHC would issue unearned checks to them, the checks were then signed by Defendant, and Sandy and Leslie would cash the checks. Sandy or Leslie would give the cash to Defendant. This scheme fell into a pattern in which they would cash checks for Defendant for amounts ending in 22 and 78 every two weeks. The Government created a spreadsheet of checks payable to Sandy and Leslie ending in 22 and 78 that it claims are forfeitable as criminal proceeds to Defendant. (Doc. No. 206-7.)

The testimony of Kyle Midkiff, a forensic accountant, proves, however, that five of these checks were altered and seven of these checks were deposited rather than cashed. Thus, these altered and deposited checks were not criminal proceeds because the evidence shows that the Government has not proven by a preponderance of the evidence that Defendant actually obtained the money from these checks. Forfeiture is limited to the money that Defendant actually acquired as the result of this check-cashing scheme, Honeycutt, 137 S. Ct. at 1635, and Midkiff's testimony is evidence that undermines this precept in regard to the altered and deposited checks.

The Government has proven that Defendant acquired the proceeds from the balance of the checks cashed in this scheme.

The Indictment alleges in Count 1 that it was part of the conspiracy that Defendant caused JCMHC to issue checks drawn on JCMHC's bank accounts to Sandy and Leslie Acosta, who then cashed the checks and gave the money to Defendant.  (Doc. No. 3 at 12, ¶¶ 61-61.)  Defendant was convicted of the conspiracy offense.  Thus, the Court finds that as part of the conspiracy, Defendant acquired $305,750 from the check-cashing scheme, excluding altered and deposited checks, and this amount is forfeitable to the Government.

### B.    Criminal Proceeds Directly Traceable to the 3rd Street Building and the 5th Street Building

The Government seeks to forfeit proceeds it claims are directly traceable the 3rd and 5th Street Buildings such that a requisite nexus exists between these buildings and the fraud.[30]  When the government seeks forfeiture of specific property, "the court must determine whether the government has established the requisite nexus between the property and the offense."  Fed. R. Crim. P. 32.2(b)(1)(A).  Under 18 U.S.C. § 981, "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" the offenses is subject to forfeiture to the United States.  § 981(a)(1)(C).

In the Third Circuit, two decisions lay the framework for tracing criminal proceeds into property for the purpose of forfeiture when a defendant's tainted funds are commingled with untainted funds.  In United States v. Voigt, the government sought forfeiture under 18 U.S.C. § 982(a) of certain pieces of jewelry it claimed were "involved in" or "traceable to" defendant's

---

[30]   Defendant still owns the 3rd Street Building.  On June 29, 2017, the 5th Street Building was sold for $3,000,000, and $2,000,000 from this sale is presently being held in escrow by the United States Marshals Service.  (Doc. No. 177 at 18 n.13, Doc. No. 177-3.)  Accordingly, the Government seeks an interest in the 3rd Street Building and the $2,000,000 in escrow from the sale of the 5th Street Building as proceeds directly traceable to these properties.

money laundering.  89 F.3d 1050, 1081 (3d Cir. 1996).  Defendant argued that the government had failed to prove that the money used to purchase the jewelry was "traceable to" his crimes because the jewelry had been purchased with funds drawn from an account containing proceeds commingled with other funds.  Id. at 1084.  He further argued that the criminal proceeds had been "'diluted' by numerous intervening deposits and withdrawals."  Id.  The Third Circuit explained that, to carry its burden, the government "must prove by a preponderance of the evidence that the property it seeks . . . in satisfaction of the amount of criminal forfeiture to which it is entitled has some nexus to the property 'involved in' the . . . offense."  Id. at 1087 (emphasis in original).  The Court continued:

> For example, if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense.  If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.
>
> Where the property involved in a money laundering transaction is commingled in an account with untainted property, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is "traceable to" money laundering activity will be difficult, if not impossible, to satisfy.

Id.  The Court held that the jewelry was not traceable to defendant's crime.  Id. at 1088.

In United States v. Stewart, however, the Third Circuit distinguished the facts of Voigt from the facts of its case.  185 F.3d 112, 129 (3d Cir. 1999).  In Stewart, rather than seeking property purchased with commingled funds, the government sought money in an account.  Id. The Court explained that their case did not involve numerous withdrawals and deposits because the account had been frozen.  Id.  Unlike in Voigt, it was not difficult to separate the tainted funds from the untainted funds, and the money in the account was directly forfeitable.  Id.; see also United States v. Little, 2:12-CR-539, 2016 WL 1255626, at *2 (E.D. Pa. Mar. 31, 2016) (holding

that defendant's house, purchased years before the illegal activity began, was not directly forfeitable where some mortgage payments and renovations were made with tainted funds and some were made with untainted funds, "such that they 'cannot be divided without difficulty.'" (quoting 21 U.S.C. § 853(p)(1))).

Subsequent Courts of Appeals have applied <u>Voigt</u> and <u>Stewart</u>, concluding that assets were not directly forfeitable where tainted and untainted funds had been commingled. For example, in <u>In re Rothstein, Rosenfeldt, Adler, P.A.</u>, following defendant's conviction for mail and wire fraud and money laundering, the government sought forfeiture of his interests in certain bank accounts under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) as proceeds of his fraudulent scheme. 717 F.3d 1205, 1208-09 (11th Cir. 2013). The bankruptcy trustee for the law firm at which defendant worked opposed the forfeiture, arguing that the account contained commingled assets and thus was not subject to forfeiture as direct proceeds. <u>Id.</u> at 1211.

In support of forfeiture, the government filed an FBI Agent's affidavit, which detailed transfers in and out of the account. <u>Id.</u> at 1213-14. The tracing focused on the timing of deposits and utilized a "lowest intermediate balance rule" to divide tainted and untainted funds. <u>Id.</u> at 1214. Based on this method, "where a set amount of proceeds is deposited into an account and commingled with other funds," the account can be considered "traceable proceeds" to the extent of the amount deposited "as long as the account balance never falls below that sum." <u>Id.</u> (quoting <u>United States v. Banco Cafetero Panama</u>, 797 F.2d 1154, 1159 (2d Cir. 1986)).

The Eleventh Circuit was not persuaded by this tracing method, holding: "[I]f ever there was a case where commingled proceeds 'c[ould not] be divided without difficulty' and therefore required the Government to seek forfeiture pursuant to the statutes' substitute property provisions, §§ 1963(m) and 853(p), this is that case." <u>Id.</u> (second alteration in original) (quoting

Voigt, 89 F.3d at 1087). The funds could not be forfeited as direct proceeds. Id.; see also United

States v. Ayika, 837 F.3d 460, 473-74 (5th Cir. 2016) (acknowledging that based on Voigt and

Stewart, where "the balance of a commingled, but largely static, account is sought for forfeiture,

traceability under [18 U.S.C.] § 982(a)(7) can be possible" but that government failed to prove

that funds in an account were traceable where its forensic accountant proved that only 33.5% of

the funds were gross proceeds of the crime); United States v. Black, 526 F. Supp. 2d 870, 887-

890 (N.D. Ill. 2007) (holding that government failed to establish a sufficient nexus between

properties and proceeds for forfeiture under § 981(a)(1)(C), where it argued that defendant used

proceeds to cover expenses and make improvements to properties by attempting to show that

proceeds were deposited into the account and, a few weeks later, used for improvements). Under

this framework, the Court will address the tracing of each category of proceeds in turn.

### 1. The Government Has Not Proven that $25,600 in Rent-Related Funds Were Used to Pay the Mortgage on the 3rd Street Building

The Government contends that it has sufficiently traced $25,600 in criminal proceeds to

the 3rd Street Building by offering the testimony of Joseph Piccione, a litigation financial

analyst.[31] (Doc. No. 177 at 22.) The Government argues that this amount is directly forfeitable

from the 3rd Street Building under § 981(a)(1)(C). (Id.)

The Court concludes that the Government has not met its burden of proving that $25,600

in criminal proceeds was used to make mortgage payments on the 3rd Street Building. At the

forfeiture hearing, Piccione testified that he attempted to trace the disposition of above-market

---

[31] In its Motion for a Preliminary Order of Forfeiture, the Government argued that Piccione had proven that $25,640 in proceeds was sufficiently traced to the 3rd Street Building. (Doc. No. 177 at 22.) At the forfeiture hearing, however, Piccione testified that he had inadvertently included an extra $40 in the amount. (Piccione Tr. at 109:14-21, Jan. 18, 2018.) In its Post-Hearing Reply, the Government acknowledges the $40 error and clarifies that it seeks $25,600 in proceeds traceable to the 3rd Street Building. (Doc. No. 209 at 12; Doc. No. 209-1 ¶ 6.B.)

rent from rent checks deposited into Defendant's accounts to establish a nexus between her criminal proceeds and specific assets. (Piccione Tr. at 111:22-112:3; 112:16-19; 113:3-5, Jan. 18, 2018.) To trace the proceeds, he would identify rent checks deposited into her accounts and use above-market rent as proceeds traceable to mortgage payments. (Id. at 125:6-126:8.) If Defendant's account fell below the proceeds amount between the date of deposit and the date of the mortgage payment, he was able to apply only the amount that remained in the account to the mortgage payment. (Id. at 126:9-128:1.) Piccione created a spreadsheet of his tracing, which he contended was supported by three booklets of the banking documents upon which he relied. (Forfeiture Hr'g Exs. G-5, G-6A to G-6C.)

Here, however, like the money used to purchase the jewelry in Voigt, the mortgage payments were made with funds drawn on accounts that contained crime proceeds commingled with untainted funds. See Voigt, 89 F.3d at 1084. Intervening deposits and withdrawals diluted defendant's criminal proceeds. For example, Piccione testified that on one occasion, $700,000 was transferred from a personal account into the account of Norris Hancock, the account from which Piccione was tracing funds to the mortgage. (Piccione Tr. at 144:5-9, Jan. 18, 2018.) Unlike the account in Stewart, Defendant's account was not frozen and was subject to intervening deposits and withdrawals. Under these circumstances, tracing was nearly impossible.

Piccione used a method of tracing similar to that employed by the FBI Agent in In re Rothstein, Rosenfeldt, Adler, P.A., 717 F.3d at 1213-14. Just as in that case, Piccione focused on the timing of deposits and maintaining a minimum balance to divide tainted and untainted funds. As the Eleventh Circuit held in In re Rothstein, Rosenfeldt, Adler, P.A., this Court finds that the commingling that occurred here prevented the funds from being divided without difficulty. As

such, the Government has not proven by a preponderance of the evidence that $25,600 of the 3rd Street mortgage was paid with criminal proceeds, and this amount of the 3rd Street Building will not be forfeited as direct proceeds of Defendant's crimes.

### 2. The Government Has Not Proven that $210,813 in Rent-Related Funds Were Used to Pay Down the Mortgage on the 5th Street Building But Has Proven that JCMHC Paid $599,000 in Construction Costs for the 5th Street Building

The Government argues that it has sufficiently traced a total of $809,813 in criminal proceeds to the 5th Street Building. (Doc. No. 177 at 17.) First, it argues that it has proven through the testimony of Piccione that $210,813 from rent proceeds was used to make mortgage payments on the 5th Street Building.[32] (Id.) Second, the Government argues that it proved at trial that Defendant spent $599,000 of JCMHC's funds to renovate the 5th Street Building. (Id.)

#### i. The Government Has Not Proven the Requisite Nexus Between $210,813 in Rent-Related Funds and the 5th Street Building

The Government contends that Piccione's tracing of rent proceeds through Defendant's accounts to mortgage payments on the 5th Street Building is sufficient to prove the requisite nexus between the money and the 5th Street Building for direct forfeiture under § 981(a)(1)(C). (Doc. No. 177 at 17.) The Court concludes that, like the 3rd Street Building, the Government has not met its burden of proving that $210,813 in crime proceeds were used to pay the mortgage on the 5th Street Building.

With respect to the 5th Street Building, Piccione used the same tracing method as he did on the 3rd Street Building to trace proceeds from unauthorized rent payments to mortgage

---

[32] The Government actually contends that it is entitled to $211,000 in rent proceeds traced to the 5th Street Building. (Doc. No. 177 at 17.) This figure, however, is the product of the Government rounding up the total amount from rent proceeds. (Piccione Tr. at 152:13-14, Jan. 18, 2018.) Instead, the exact amount traced from rent checks totals $210,813. (Id. at 152:9.) Thus, the Court will use the $210,813 amount, rather than $211,000, as the amount of the rent checks that the Government attempted to trace to the 5th Street Building.

payments. (Piccione Tr. at 112:4-7, Jan. 18, 2018.) In this case, the mortgage payments on the 5th Street Building were made from funds in the same accounts as the mortgage payments on the 3rd Street Building, which contained commingled tainted and untainted funds. Given the fact that intervening deposits and withdrawals diluted Defendant's criminal proceeds, tracing was rendered nearly impossible. See Voigt, 89 F.3d at 1087. In fact, Piccione testified on cross-examination: "The money I was looking to match up with the monies going out, once we comingle . . . with those kinds of amounts, it becomes impossible." (Piccione Tr. at 144:20-22, Jan. 18, 2018.) He continued:

> While I was able to determine the criminal proceeds at the point in which they were deposited, there is a material comingling, . . . my ability to use the criminal proceeds to . . . demonstrate the nexus between the criminal proceeds and the payment that I'm looking to establish, the payments going to the assets, that falls away. And that was the problem here. The comingling prevents me from creating that nexus—from demonstrating that nexus.

(Id. at 146:9-16.) Although Piccione alleged that he was able to trace $210,813 to mortgage payments on the 5th Street Building, the Court finds that the Government has failed to prove by a preponderance of the evidence that the payments were in fact made with proceeds. Accordingly, this amount from the 5th Street Building will not be directly forfeitable.

### ii. The Government Has Proven the Requisite Nexus Between $599,000 in Construction Costs and the 5th Street Building

The Government submits that JCMHC paid $599,000 in construction costs to renovate the 5th Street Building as part of the scheme to defraud and that this amount is traceable to the 5th Street Building as directly forfeitable proceeds. (Doc. No. 177 at 17.) The Court agrees.

The Government has proven the requisite nexus between the $599,000 in construction costs and the 5th Street Building, rendering these proceeds directly forfeitable. Defendant acquired $599,000 in criminal proceeds from JCMHC's unauthorized payment of construction costs. These funds, unlike rent checks purportedly traced to mortgage payments, do not have the

same tracing problem because they were not traced through accounts containing commingled funds. Instead, the funds were used to pay construction costs. Accordingly, the Government has "established the requisite nexus" between the construction costs and the 5th Street Building, Fed. R. Crim. P. 32.2(b)(1)(A), and $599,000 of the 5th Street Building is directly forfeitable as "derived from proceeds traceable to" Defendant's crimes. § 981(a)(1)(C).

### C. Defendant Must Forfeit $959,100 of the Escrow Proceeds from the 5th Street Building, Accounting for the Building's Appreciated Value

The Government argues that it is entitled to forfeiture of the crime proceeds traced to the 5th Street Building, as well as the corresponding pro-rata share of its appreciated value. (Doc. No. 177 at 20.)

It is well-settled that "[a]ll proceeds obtained from unlawful conduct and property traceable to those proceeds are subject to criminal forfeiture." United States v. Bentacourt, 422 F.3d 240, 250-51 (5th Cir. 2005) (holding that forfeiture of $5.4 million in lottery proceeds from a lottery ticket purchased with drug proceeds was proper, noting that the fact that defendant "used his drug proceeds to generate a very large return by winning the Texas lottery is of no import in the forfeiture analysis").

Where criminal proceeds are used to purchase or renovate a property, the Government is entitled to forfeiture of the proportion of the property traceable to criminal proceeds, including appreciation on that proportion. See, e.g., United States v. Hill, 46 F. App'x 838, 839 (6th Cir. 2002) (holding that appreciated value of stock shares were forfeitable as "directly 'traceable to' the original shares involved in the money laundering conviction"); United States v. Vogel, Crim. A. No. 4:08cr224, 2010 WL 547344, at *3-4 (E.D. Tex. Feb. 10, 2010) (concluding that where condominium was purchased with criminal proceeds, funds from the sale of the condominium, which had appreciated by $1.5 million, would be subject to forfeiture); United States v. Rafferty,

No. 04-20478-CR, 2007 WL 3231830, at *4 (S.D. Fla. Oct. 30, 2007) (concluding that because property into which defendant invested criminal proceeds appreciated by sixty-four percent, the forfeitable amount of the property was the proportionate value of his tainted investment plus sixty-four percent appreciation); United States v. Loe, 49 F. Supp. 2d 514, 521-23 (E.D. Tex. 1999) (stating that forfeitable interest in the property was "a proportion of the property equal to the percentage of the tainted funds used to purchase the property").

For example, in United States v. Loe, after defendants were convicted of crimes including mail and wire fraud and money laundering, the government sought forfeiture under 18 U.S.C. § 982(a)(1) of, among other assets, defendants' real property. 49 F. Supp. 2d at 516-517. Evidence at trial proved that the property was purchased with $507,491.11 (52.6%) in tainted funds and $457,508.89 (47.7%) in untainted funds. Id. at 520-21. Appraisal of the property revealed that since its purchase, the property had appreciated by $500,000. Id. at 520. The court concluded that 52.6% of the property, purchased with tainted funds, was subject to forfeiture as property traceable to the money laundering. Id. at 521. The remaining 47.7% of the property, purchased with untainted funds, was not subject to forfeiture. Id. The Court held that "the United States and Defendants should share in any appreciation of the property in relation to their ownership interests." Id. at 524. Thus, the government was entitled to the proportion of the property purchased with tainted funds, plus any appreciation on that proportion. Id.

In addition, in United States v. Hawkey, the Eighth Circuit held that forfeiture of the appreciated value of a property was proper regardless of whether the value increased due to appreciation over time or improvements made by defendant. 148 F.3d 920, 928 (3d Cir. 1998). The court held that where an entire motor home was "involved in" or "traceable to" the unlawful monetary transaction, the home was forfeitable "without regard to any increased value that

[defendant] may have added." Id. "Irrespective of whether the increased value to the converted property [was] the result of wise investment, personal effort by [defendant], or by adding [defendant's] personal untainted funds, because the converted property [was] traceable to the unlawful monetary transaction, . . . the property [was] subject to forfeiture . . . ." Id.

Here, as noted, $599,000 in crime proceeds was used to renovate the 5th Street Building. Therefore, $599,000 of the value of the 5th Street Building is traceable to Defendant's fraudulent scheme. See § 981(a)(1)(C). Defendant purchased the 5th Street Building for $650,000 and spent $625,000 on its renovations, using money that the Government has not proven was tainted. Accordingly, $599,000 in criminal proceeds contributed to the 5th Street Building represents 31.97% of its value, while $650,000 and $625,000 in untainted funds represent 68.03% of the its value.

The 5th Street Building appreciated in value and was sold for $3,000,000. (Doc. No. 177-3 at 2.) Thus, the Government is entitled to the appreciation on the proportion of the building traceable to criminal proceeds—here, 31.97%. See, e.g., Rafferty, 2007 WL 3231830, at *4 (stating that forfeitable amount of property was the proportionate value of tainted investment plus appreciation). The 31.97% proportion of the 5th Street Building attributable to criminal proceeds appreciated in value by $360,100. As a result, the total 31.97% forfeitable proportion of the 5th Street Building is $959,100—the $599,000 in construction costs, plus the appreciation of $360,100 on that amount. See United States v. Real Prop. at 7401-7403 S. Racine Ave., Chi., Ill., No. 04 C 5885, 2010 WL 1286885, at *8, *11 (N.D. Ill. Mar. 30, 2010) (holding that under § 981(a)(1)(C), "[t]he Government is only entitled to the portion of the property that was purchased with proceeds of unlawful activity" and "the appreciation for that share of the property"); United States v. Wahlen, 459 F. Supp. 2d 800, 814 (E.D. Wis. 2006)

("[T]he portions of the real properties which are subject to forfeiture include appreciation attributable to the criminal proceeds."). Accordingly, $959,100 in proceeds traceable to the 5th Street Building will be forfeited to the Government.[33]

D. **Defendant Must Forfeit Substitute Assets to Satisfy the Forfeiture Judgment**

The Government submits that it is entitled to forfeiture of substitute assets pursuant to 21 U.S.C. § 853(p) to satisfy the remainder of the forfeiture judgment not traceable into Defendant's assets due to her conduct in preventing tracing. (Doc. No. 177 at 23-24.)

As noted, 28 U.S.C. § 2461(c) provides that the procedures of 21 U.S.C. § 853 apply to all stages of a criminal forfeiture proceeding. § 2461(c). Section 853 authorizes a forfeiture money judgment "for the full amount of the criminal proceeds" even when "the amount of the judgment exceeds the defendant's available assets at the time of conviction." United States v. Vampire Nation, 451 F.3d 189, 202-03 (3d Cir. 2006). If any property traceable to the crime is unavailable, a court must direct forfeiture of "substitute property" under the conditions described in § 853(p). That provision provides:

**(1) In general**

Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant—

**(A)** cannot be located upon the exercise of due diligence;

**(B)** has been transferred or sold to, or deposited with, a third party;

**(C)** has been placed beyond the jurisdiction of the court;

**(D)** has been substantially diminished in value; or

**(E)** has been commingled with other property which cannot be divided without difficulty.

---

[33] The 5th Street Building is no longer owned by Norris Hancock, Defendant's solely-owned company. Therefore, proceeds held in escrow sourced from the sale of the building will be forfeited as substitute assets. See infra Section V.D.

**(2) Substitute property**

In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

§ 853(p)(1)-(2).

Section 853(p) is not discretionary but instead "mandates forfeiture of substitute assets 'when the tainted property has been placed beyond the reach of a forfeiture.'" United States v. Alamoudi, 452 F.3d 310, 314 (4th Cir. 2006) (quoting United States v. McHan, 345 F.3d 262, 271 (4th Cir. 2003)). Importantly, the government can only seize such substitute property under § 853(p) "'up to the value of' the tainted property" if it can prove that defendant caused one of the five conditions. Honeycutt v. United States, 137 S. Ct. 1626, 1634 (2017) (quoting § 853(p)(2)). This provision "provides a means for the Government to recoup the value of" tainted property "if it has been dissipated or otherwise disposed of by 'any act or omission of the defendant.'" Id. (quoting § 853(p)(1)). "The Government generally has little difficulty in making the necessary showing under § 853(p)." United States v. Napoli, 661 F. App'x 221, 223 (3d Cir. 2016) (per curiam) (quoting United States v. Gordon, 710 F.3d 1124, 1167 (10th Cir. 2013)).

Section 853(p)(1)(A) applies where the proceeds of a defendant's criminal conduct cannot be located upon the exercise of due diligence. See, e.g., United States v. Garza, 407 F. App'x 322, 324 (10th Cir. 2011); Alamoudi, 452 F.3d at 315. Courts have found due diligence based on statements or affidavits of law enforcement agents describing their efforts to trace funds. See Garza, 407 F. App'x at 324 (finding requirements met for § 853(p) where special agent submitted affidavit stating that an analysis of defendant's financial records revealed no traceable assets); Alamoudi, 452 F.3d at 315 (basing conclusion that requirements of § 853(p) had been satisfied on the uncontested affidavit of FBI agent describing her efforts to locate

funds).  Section 853(p)(1)(E) applies where "a defendant has commingled laundered funds with untainted funds—whether in a bank account or in a tattered suitcase—such that they 'cannot be divided without difficulty.'"  United States v. Voigt, 89 F.3d 1050, 1088 (3d Cir. 1996) (quoting § 853(p)(1)(E)).

In the instant case, $959,100 of Defendant's crime proceeds is traceable to the 5th Street Building.  As noted, however, Defendant's entire crime proceeds total $2,401,850.  Thus, after forfeiture of $959,100 traced to the 5th Street Building, $1,442,750 in untraceable criminal proceeds remains.  To fulfill this remaining money judgment, the Government seeks the following as substitute assets: (1) the remaining funds in escrow from the sale of the 5th Street Building; (2) the 3rd Street Building; (3) Defendant's property at 6615 Monmouth Avenue, Ventnor, New Jersey; (4) Defendant's property at 9401-11 Pacific Avenue, Apartment 9, Margate, New Jersey; and (5) Defendant's property at 2118-20 North Hancock Street, Philadelphia, Pennsylvania.  (Doc. No. 177 at 26-27.)  The Government represents that none of these properties is Defendant's primary residence.  (Id. at 26 n.21.)  Defendant has not disputed her ownership of any of these properties.

The Government has proven that as a result of Defendant's actions, her criminal proceeds could not be located "upon the exercise of due diligence" and "have been commingled with other property that cannot be divided without difficulty."  § 853(p)(1)(A), (E).  To prove the exercise of due diligence under § 853(p)(1)(A), the Government offered the testimony of Joseph Piccione, a litigation financial analyst, who detailed his efforts to trace Defendant's proceeds into particular assets.  He described at length the documents he reviewed and the accounts he analyzed in an attempt to follow the flow of criminal funds.  And he supported his testimony with documents, checks, and records from Defendant's bank accounts.  Thus, through the

testimony of Piccione, the Government has demonstrated that it exercised due diligence to locate the proceeds of Defendant's crimes, fulfilling § 853(p)(1)(A).  See Napoli, 661 F. App'x at 223 (affirming finding that government exercised due diligence in attempting to locate money based on the declaration of the Deputy U.S. Marshal, who conducted a full investigation to locate assets); United States v. Seher, 562 F.3d 1244, 1373 (11th Cir. 2009) (concluding that forfeiture of substitute assets was proper based on the "declaration from an IRS Special Agent involved in the case stating that . . . [defendant] had 'dissipated or otherwise disposed of the proceeds of his crimes'"); United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999) (finding forfeiture of other property under § 853(p) proper where government recited its efforts to locate proceeds).

The Government also has proven that forfeiture of substitute assets is warranted under § 853(p)(1)(E) because Defendant commingled proceeds with other funds that cannot be divided without difficulty.  IRS Special Agent Joseph Carl testified that Defendant would split checks from JCMHC to Norris Hancock, depositing a portion into a business account and a portion into her personal account.  (Carl Tr. at 40:12-15, June 13, 2017.)  This conduct resulted in commingling of criminal proceeds with other money.  (Piccione Tr. at 146:9-16, Jan. 18, 2018.) Piccione testified that Defendant's conduct in transferring funds between accounts, commingling funds, and use of cash made it difficult for him to trace crime proceeds into assets.  (Id. at 132:15-18; 150:8-10.)  Based on this evidence, the Government has proven that Defendant caused the conditions described in § 853(p)(1)(E).  Voigt, 89 F.3d at 1088 (quoting § 853(p)(1)(E)).

Because Defendant's conduct caused the conditions described in § 853(p)(1)(A) and (E), the Government is entitled to forfeiture of substitute assets up to the value of the untraceable forfeiture money judgment—$1,442,750.  See Voigt, 89 F.3d at 1088 ("Once property subject to

forfeiture under § 982(a)(1) is no longer identifiable due to some act of the defendant, the government may seek any property, cash or merchandise, in satisfaction of the amount of criminal forfeiture to which it is entitled."). The Government is entitled to the remaining funds in escrow after forfeiture of $959,100 in traceable proceeds and the other substitute assets that it has identified, "up to the value of" the remaining forfeiture money judgment. See § 853(p)(2).

In sum, the Government is entitled to a total money judgment of $2,401,850. Of this amount, $2,041,750 consists of funds that Defendant directly acquired from JCMHC through above-market and excessive rent and a rent deposit on the 3rd Street Building; above-market rent and a rent deposit on the 5th Street Building; construction costs paid by JCMHC to renovate the 5th Street Building; and cash acquired from a check-cashing scheme involving Sandy and Leslie Acosta. And $360,100 of this amount consists of appreciation on the proportion of the 5th Street Building attributable to criminal proceeds from construction costs paid by JCMHC.

The Government has sufficiently traced $959,100 in proceeds into the 5th Street Building, and this amount will be forfeited from the escrowed funds from the sale of the 5th Street Building. After forfeiture of the $959,100, $1,442,750 of the total money judgment will be outstanding.

To satisfy the remaining $1,442,750, the Government is entitled to seize substitute assets from Defendant under 21 U.S.C. § 853(p)(2). To satisfy this amount, the remaining $1,040,900 of the escrowed funds from the sale of the 5th Street Building will be applied to the outstanding money judgment as substitute assets. After forfeiture of the escrowed funds, the Government is entitled to satisfy the remaining $401,850 money judgment with Defendant's substitute assets. The $401,850 may be reduced by the amount of interest earned on the escrowed funds held by the United States Marshals Service.

**E.      The Forfeiture Judgment Does Not Violate the Excessive Fines Clause**

Defendant contends that pursuant to <u>United States v. Bajakajian</u>, 524 U.S. 321 (1998), the forfeiture amount that the Government seeks violates the Excessive Fines Clause of the United States Constitution because it is grossly disproportional to the gravity of the offenses.  (Doc. No. 197 at 28.)  The Government submits that because the forfeiture amount is Defendant's direct criminal proceeds and the appreciation on proceeds invested, the analysis in <u>Bajakajian</u> does not apply, but even if it did, the amount is not excessive.  (Doc. No. 201 at 19.)  The Court agrees.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."  U.S. Const. amend. VIII.  In <u>United States v. Bajakajian</u>, the Supreme Court held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."   524 U.S. 321, 334 (1998).   There, defendant attempted to leave the country without reporting that he was transporting $357,144 in cash in violation of 31 U.S.C. § 5316(a)(1)(A), which requires the reporting of sums over $10,000 transported by an individual leaving the country.  <u>Id.</u> at 324-35.  The money was seized, and defendant was indicted.  <u>Id.</u> at 325.  The government sought forfeiture of $357,144.  <u>Id.</u> at 326.

The Supreme Court explained:

> The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.

<u>Id.</u> at 334.  The Court held that under the grossly disproportional standard, forfeiture of the $357,144 would violate the Excessive Fines Clause.  <u>Id.</u> at 337.  First, the Court reasoned that defendant's crime was solely a reporting offense unrelated to any other illegal activity, and the money was proceeds of legal activity to be used to pay a lawful debt.  <u>Id.</u> at 337-38.  Second, defendant "did not fit into the class of persons for whom the statute was principally designed:

money launderers, drug traffickers, and tax evaders." Id. at 338.  Third, the sentence and fine established a "minimum level of culpability." Id.  Fourth, the Court concluded that the harm defendant caused was minimal, as only the government was affected by the conduct. Id. at 339. Given these factors, the Court held that the forfeiture was unconstitutional. Id. at 339-40.

Here, because the forfeiture is in personam, it is "punitive, being part of the punishment imposed," and therefore is subject to the Excessive Fines Clause. United States v. Beecroft, 825 F.3d 991, 1000 (9th Cir. 2016) (quoting Bajakajian, 524 U.S. at 332).  Accordingly, the Court must apply the four factors outlined in Bajakajian to determine whether forfeiture in this case is "grossly disproportional to the gravity of defendant's offense." 524 U.S. at 334.

First, Defendant engaged in a multi-year conspiracy to defraud JCMHC of large sums of money.  Unlike the reporting offense in Bajakajian, forfeiture here is proceeds gained illegally from JCMHC through her conspiracy, mail and wire fraud, and other offenses. See United States v. Viloski, 814 F.3d 104, 113 (2d Cir. 2016) (explaining that defendant's willful participation in a "multi-year conspiracy involving repeated instances of money laundering, wire fraud, and related offenses" was sufficient to support forfeiture under the first Bajakajian factor).  Thus, the first factor favors finding that forfeiture is constitutional.

Second, Defendant engaged in mail and wire fraud, theft from a healthcare benefit program, and theft from a program receiving federal funds in excess of $10,000.  These crimes fit Defendant squarely within "the class of persons for whom the statute was principally designed." See Bajakajian, 524 U.S. at 338.  The second factor supports finding that forfeiture is constitutional.

Third, Defendant's sentence and fine do not establish a minimum level of culpability. According to the Presentence Report, U.S. Sentencing Guidelines §§ 5E1.2(c)(3) and

5E1.2(h)(1)[34] provide for a fine of between $20,000 and $200,000. PSR ¶ 133. And as the Government notes, the offenses subject to forfeiture carry a statutory maximum fine of twice the gross loss or gain, or $250,000 per count, which based on all of her convictions, totals $12,250,000.[35] (Doc. No. 201 at 22 (citing 18 U.S.C. § 3571(b)). Although the total forfeiture judgment of $2,401,850 exceeds the guidelines provided in the Presentence Report, "this factor is not dispositive." United States v. Cheeseman, 600 F.3d 279, 284 (3d Cir. 2010). The Court also may consider the statutory maximum fine, which here is much greater than the forfeiture amount. Id. ("[T]he Guideline fine alone is not dispositive and we may also consider the

---

[34] Section 5E1.2 of the U.S. Sentencing Guidelines outlines fines for individual defendants. Section 5E1.2(c)(3) provides the guideline range for the minimum and maximum fine applicable to each offense level. Section 5E1.2(h)(1) instructs that for offenses committed before November 1, 2015, a court should "use the applicable fine guideline range that was set forth in the version of § 5E1.2(c) that was in effect on November 1, 2014, rather than the applicable fine guideline range set forth in subsection (c) above." § 5E1.2(h)(1).

[35] 18 U.S.C. § 3571(b) lays out the fines for individuals found guilty of mail and wire fraud, theft from a health care benefit program, and theft from a program receiving federal funds. Section 3571(b) provides:

**(b) Fines for individuals.**—Except as provided in subsection (e) of this section, an individual who has been found guilty of an offense may be fined not more than the greatest of—

**(1)** the amount specified in the law setting forth the offense;

**(2)** the applicable amount under subsection (d) of this section;

**(3)** for a felony, not more than $250,000;

**(4)** for a misdemeanor resulting in death, not more than $250,000;

**(5)** for a Class A misdemeanor that does not result in death, not more than $100,000;

**(6)** for a Class B or C misdemeanor that does not result in death, not more than $5,000; or

**(7)** for an infraction, not more than $5,000.

§ 3571(b).

statutory maximum fine that Cheeseman faced."). Thus, given that Defendant's forfeiture is a fraction of the statutory maximum, this factor weighs against finding the forfeiture unconstitutional. See United States v. Young, 618 F. App'x 96, 98 (3d Cir. 2015) ("[G]iven that Young's fine was less than half of the statutory maximum, we do not make much of the fact that it exceeded the advisory Guideline range.").

Finally, the harm that Defendant caused was not "minimal." Defendant caused extensive loss to JCMHC through her theft, and prevented JCMHC from having the financial means to provide additional services to members of the community. Taking this factor into account, with the other Bajakajian factors, the Court finds that the forfeiture amount is not grossly disproportional to the gravity of Defendant's offenses.

## VI. CONCLUSION

For all the foregoing reasons, the Government's Motion for a Preliminary Order of Forfeiture (Doc. No. 197) is granted in part and denied in part. An appropriate Order follows.